IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-10160
_____

JERRY LEE HOGUE,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
_____
December 12, 1997

Before GARWOOD, HIGGINBOTHAM and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioner-appellant Jerry Lee Hogue (Hogue) appeals the
district court's denial of his petition for habeas corpus under 28
U.S.C. § 2254 challenging his 1980 Texas conviction and death
sentence for murder committed while committing arson. Hogue's
primary complaint on appeal is that the admission in evidence at
the punishment phase of his trial of a 1974 Colorado guilty plea
rape conviction, which in 1994 a Colorado court set aside finding
Hogue's counsel there had provided constitutionally ineffective
assistance, rendered his death sentence invalid under *Johnson v.*

*Mississippi*, 108 S.Ct. 1981 (1988). We reject this claim, holding it procedurally barred by Hogue's failure to object at trial, and, alternatively, because we conclude that under *Brecht v. Abrahamson*, 113 S.Ct. 1710 (1993), the admission of the prior conviction did not substantially influence the jury's answer to either of the two punishment issues. We also hold that Hogue is entitled to no relief on either of the two remaining contentions he raises in this appeal, one relating to an allegedly biased juror and the other to the constitutional validity of treating murder while committing arson as a capital offense where the death is caused by the arson. Accordingly, we affirm.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

Hogue was indicted for the January 13, 1979, murder of Jayne Lynn Markham (Markham) committed in the course of committing arson, contrary to Texas Penal Code § 19.03(a)(2).[2] At his March 1980

---

[1]    This habeas petition was filed (and ruled on below and certificate of probable cause was granted) prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The provisions of AEDPA §§ 101-106, codified at 28 U.S.C. §§ 2241-2255, are inapplicable to habeas cases filed prior to its effective date. *Lindh v. Murphy*, 117 S.Ct. 2059 (1997). We have held that "Texas is not yet eligible to take advantage of the provisions" of AEDPA § 107, codified at 28 U.S.C. §§ 2261-2266. *Mata v. Johnson*, 99 F.3d 1261, 1267 (5th Cir. 1996), *vacated in other respects*, 105 F.3d 204 (5th Cir. 1997). Consequently, we apply the law as it exists apart from the AEDPA.

[2]    Texas Penal Code § 19.03(a)(2), as in effect when the offense was committed and when Hogue was tried, provided that capital murder was committed if one committed murder (defined in Texas Penal Code § 19.02 as "intentionally or knowingly causes the death of an individual") "and . . . (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, robbery, rape, or arson." Arson is defined in Texas Penal Code § 28.02(a) as being committed by a person "if he starts a fire or causes an explosion . . . without the effective

2

trial, at which Hogue was represented by attorneys Coffee and Roe, the jury found Hogue guilty of capital murder and following the subsequent punishment hearing answered affirmatively each of the two special issues called for by the then version of Texas Code of Criminal Procedure Art. 37.071, finding that Hogue's conduct causing Markham's death was committed deliberately with the reasonable expectation that her or another's death would result and that there was a probability he would commit criminal acts of violence constituting a continuing threat to society.[3] Hogue was accordingly sentenced to death. On direct appeal, Hogue was initially represented by attorney Burns, who, on Hogue's request, was replaced by attorney Gray. In March 1986, the Texas Court of Criminal Appeals, en banc, unanimously affirmed the conviction and

---

consent of the owner and with intent to destroy or damage the owner's building or habitation." The indictment alleged that Hogue:

> "did then and there intentionally cause the death of an individual, Jayne Lynn Markham, by setting fire to the house occupied by the said Jane Lynn Markham, and as a result of the said fire, the death of the said Jayne Lynn Markham was caused by asphyxiation due to smoke and carbon monoxide and caused by conflagration to the body of the said Jayne Lynn Markham, and the death of the said Jayne Lynn Markham was intentionally committed in the course of committing and attempting to commit the offense of arson; . . ."

[3] A prior trial in December 1979 had terminated during jury deliberations at the guilt-innocence stage when a mistrial was declared following the court's receipt of a note from the jury foreman stating "we have followed your additional instructions and have continued our deliberations. Nothing has changed. We still stand 10 Guilty 2 Not Guilty with no reasonable expectation of a change of opinion."

sentence (two judges concurred in the result without opinion), and in October 1986 the Supreme Court denied *certiorari*. *Hogue v. State*, 711 S.W.2d 9 (Tex. Crim. App.), *cert. denied*, 107 S.Ct. 329 (1986).

*Prior Habeases*

There then ensued a lengthy series of habeas filings by Hogue and his attorneys, which we outline as follows.[4]

In January 1987, Hogue, through attorney Alley, filed his first state habeas, which was amended on February 18, 1987. An evidentiary hearing was held on this petition on February 24, 1987, at which Hogue was represented by Alley. The petition was ultimately denied by the Court of Criminal Appeals on March 18, 1987. In the meantime, Hogue's execution had been set for March 24, 1987. On March 20, 1987, Hogue, again through Alley, filed his second state habeas petition and motion for stay of execution, each of which the Court of Criminal Appeals denied on March 22, 1987. On the same day, Hogue, through Alley, filed in the district court below his first federal habeas. The district court granted a stay of execution. On May 7, 1987, Hogue, *pro se*, moved to dismiss Alley, alleging that Alley was not authorized to file the federal habeas petition. On May 27, Hogue, *pro se*, moved to amend the federal petition to add forty-nine additional grounds. On July 9, 1987, the district court dismissed the federal petition without prejudice as having been filed without Hogue's authorization, and

---

[4]    A more detailed description appears in the district court's opinion. *See Hogue v. Scott*, 874 F.Supp. 1486, 1496-1500, 1512-1514 (N.D. Tex. 1994).

vacated the stay of execution.  On August 11, 1987, Hogue, *pro se*, filed his third state habeas application, and on August 19, 1987, attorney Burns filed a state habeas application on Hogue's behalf. These latter two applications were treated as consolidated and on September 25, 1987, were denied by the Court of Criminal Appeals, which also denied stay of execution, which had been set for September 29, 1987.

Also on September 25, 1987, Hogue, through attorneys Mason and Bruder, filed in the district court below an application for stay of execution to permit the filing of a habeas petition in that court, and the district court granted the stay.  On October 17, 1987, the district court issued its order directing that Hogue, on or before January 8, 1988, file a habeas proceeding in that court under section 2254 or a state court habeas proceeding, in which Hogue would "present each and every claim known to Petitioner or his counsel on pain of waiver."  On January 8, 1988, the district court, on motions filed that day by Hogue, extended the January 8, 1988, deadline to January 22, 1988.  On March 29, 1988, the district court, having learned that Hogue was pursuing a state habeas proceeding, vacated the stay of execution it had previously entered and dismissed without prejudice the federal proceedings.

Previously, on January 22, 1988, Hogue, through Mason and Bruder, had filed his fourth state habeas petition (identified in the state trial court as No. C-3-1330-162441-D).  Evidentiary hearings, at which Hogue was represented by Mason, were held on this petition on March 24, 1988 (at which Bruder was also present

5

on behalf of Hogue), and August 8, 1988, and a deposition was taken (at which Hogue was represented by Mason). The state trial court made findings of fact and conclusions of law and recommended denial of relief. On January 9, 1989, the Court of Criminal Appeals issued its order denying relief on this habeas (Court of Criminal Appeals No. 16,907-4), noting that it had "carefully reviewed the record" and that "the trial court's findings and conclusions are fully supported by the record."

On April 13, 1989, Hogue, through Mason and Bruder, filed another section 2254 petition in the district court below. On April 18, 1989, the district court stayed Hogue's execution, which had been scheduled for April 20, 1989. On March 16, 1990, Hogue, through Mason and Bruder, moved to dismiss or stay the section 2254 proceedings so he could return to state court to seek relief suggested by *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989). In July 1990, Mason and Bruder filed a motion to withdraw from their representation of Hogue as he had claimed their inadequate representation entitled him to relief. Also in July 1990, Hogue, *pro se*, filed in the federal proceeding a pleading complaining of his counsel's failure to investigate certain claims and, later, a memorandum opposing the request of Mason and Bruder to withdraw. On August 22, 1990, the district court appointed Mason and Bruder under the Criminal Justice Act, so they could be compensated, and also appointed an investigator to assist them. This order directed that by October 19, 1990, a supplemental pleading be filed asserting each issue Hogue sought to raise. On November 16, 1990,

6

Hogue, *pro se*, moved in the federal proceeding to dismiss Mason and Bruder, and to dismiss his section 2254 proceeding without prejudice so he could return to state court. The district court on March 7, 1991, dismissed the cause without prejudice, noting Hogue's November 16, 1990, motion.

On March 22, 1991, Hogue, *pro se*, filed his fifth state habeas petition (identified in the state trial court as No. C-3-1647-16241-E). On August 5, 1991, the state trial court recommended denial of relief and transmitted the file to the Court of Criminal Appeals. On September 18, 1991, the Court of Criminal Appeals entered its order on this application (identified in the Court of Criminal Appeals as Writ No. 16,907-05), reciting that "[a]ll of the allegations have been raised and rejected either on direct appeal or in previous applications for writ of habeas corpus" and "[w]e hold that the applicant's contentions are not only without merit but have been waived and abandoned by his abuse of the writ of habeas corpus." The order goes on to direct the Clerk of the Court of Criminal Appeals:

> "not to accept or file the instant application for writ of habeas corpus. He is also instructed not to accept in the future any applications for a writ of habeas corpus attacking this conviction unless the applicant has first shown that any contentions presented have not been raised previously and a showing is made that they could not have been presented in any earlier application for habeas corpus relief."[5]

Meanwhile on September 3, 1991, Hogue, through attorneys

---

[5] The September 18, 1991, order at this point continues by citing *Ex Parte Dora*, 548 S.W.2d 392 (Tex. Crim. App. 1977) and *Ex Parte Bilton*, 602 S.W.2d 534 (Tex. Crim. App. 1980).

Crocker (whom the state trial court had appointed to represent Hogue on May 2, 1991) and Owen, tendered for filing in the state court on Hogue's behalf his sixth state habeas application (identified in the state trial court as No. C-3-1647-16241-F). This application, which runs 173 pages exclusive of exhibits, asserts 36 grounds for relief. On October 17, 1991, the state trial court signed an order, responsive to the Court of Criminal Appeals' September 18, 1991, order, identifying three issues raised in Hogue's sixth state habeas "which have not been and could not have been raised in previous proceedings." In response to a motion filed November 13, 1991, by Hogue, through Crocker and Owen, the state trial court modified its October 17, 1991, order by slightly rewording its statement of the three available issues.[6] In December 1991, the state trial court denied a motion filed by Hogue, through Crocker and Owen, to permit the filing of Hogue's sixth state habeas petition. On March 6, 1992, the state trial

---

[6]     The three available issues thus identified in this order are as follows:

> "A.   The state prevented counsel from investigating, developing, and presenting relevant mitigating evidence in support of a life sentence for Mr. Hogue.
>
> B.    Trial Counsel denied Mr. Hogue effective assistance of counsel throughout the course of his trial: Failure to investigate and present mitigating evidence.
>
> C.    The Texas capital sentencing statute improperly precluded the jury from considering evidence in mitigation of Mr. Hogue's sentence."

court issued an order adopting, with modifications, the state's proposed memorandum, findings, and conclusions, recommending denial of relief with respect to the three available issues identified in the trial court's October 17, 1991, order as modified (*see* note 6, *supra*). The March 6, 1992, order directed that the file be transmitted to the Court of Criminal Appeals, where it was received March 11, 1992. On March 16, 1992, the Court of Criminal Appeals, through its Executive Administrator, wrote the state trial court with respect to Hogue's sixth state habeas writ (reflecting copies being sent to Hogue, Crocker, counsel for the state, and the state district clerk) as follows:

> "Re: Writ No. 16,907-06
> Jerry Lee Hogue
> Trial Court No. C-3-1647-16241-F

> Dear Judge Leonard:

> On September 18, 1991, this Court entered an order citing the above referenced applicant with abuse of the writ.

> The present application does not satisfy the requirements for consideration set out in the order described above. Therefore, this Court will take no action on this writ.

> For further information see Ex parte Dora, 458 S.W.2d 392 (Tex.Cr.App. 1977)."

Hogue's execution was thereafter set for May 28, 1992. There were no further state court filings.

*This Habeas*

The instant section 2254 petition was filed by Hogue, through

9

Crocker and Owen, on May 19, 1992.[7]  It is 184 pages long (and is accompanied by more than 700 pages of exhibits and by a memorandum which, together with its own exhibits, occupies more than 400 pages in the record) and raises 33 grounds of relief.  On May 22, 1992, the district court granted Hogue's requested stay of execution.  On June 12, 1992, an amended habeas petition was filed, adding two grounds for relief, but not otherwise altering the original petition.  On November 2, 1992, the State filed its answer and motion for summary judgment.  The matter was referred to a Magistrate Judge for recommendations and proceedings as deemed appropriate.  On March 14, 1994, the Magistrate Judge issued a 126-page report and recommendations, recommending denial of all relief.  Hogue filed objections to the report and recommendations.  The district court afforded de novo consideration to all of Hogue's asserted grounds for relief.  On November 16, 1994, the district court entered judgment denying all relief, together with a thorough and comprehensive opinion reciting in detail the course of proceedings at trial and on direct appeal, the evidence presented at trial, and the course of Hogue's prior habeases, and addressing and disposing of all of Hogue's asserted grounds for relief in his current habeas.  *Hogue v. Scott*, 874 F. Supp. 1486 (N.D. Tex. 1994).  On January 18, 1995, the district court denied Hogue's Rule

---

[7]    Hogue has been represented by counsel in the district court, and in this Court, throughout all stages of the instant section 2254 proceedings.

59(e) motion with a brief opinion.  *Id*. at 1545-46.[8]

*Offense Circumstances*

The Court of Criminal Appeals' opinion generally describes the circumstances of the offense:

> "The evidence introduced at trial showed that appellant [Hogue] and his wife rented a house located at 2412 Southcrest in Arlington on November 9, 1978. Approximately one month later, on December 4, 1978, appellant and his wife vacated the house without turning in their key, leaving a refrigerator, a round wall ornament and some trash.  The property was cleaned up and on December 24 the house was leased to Mary Beth Crawford and Jayne Markham.  Living at the house with the two women were Markham's eight-year-old son and Steve Renick, a friend of the women.
>
> On a Wednesday, January 10, two days before the commission of this grisly and brutal crime, appellant returned to the house.  When Markham answered the door, appellant told her he had lived in the house and had left a wall hanging at the house and asked if he could get it. Markham let appellant in the house and they began conversing. Apparently some sort of amiable relationship between Markham and appellant was struck because appellant stayed at the house for quite a long time that evening.  On Thursday, appellant again showed up at the house.  Markham had agreed to buy some used furniture from appellant so she went with him to pick up the furniture.  When they arrived back at the house, once again appellant stayed for the duration of the evening. Eventually the women went to bed and only appellant and Renick were awake.  Appellant asked Renick if he knew where he could get a gun.  Renick showed appellant the gun he kept in his footlocker.  After cleaning the gun, Renick loaded it and placed it back inside the footlocker.
>
> Appellant was at the house again early the next morning.  Renick went to work and Crawford took Markham's son to school.  On her way home she stopped at the grocery store.  When she returned home, she prepared breakfast for herself, Markham and appellant.  Crawford noticed that Markham seemed upset.  While the trio were eating breakfast, appellant suddenly blurted out that he

---

[8] Hogue filed a timely notice of appeal, and on February 14, 1995, the district court issued a certificate of probable cause.

11

was a police officer and that he was arresting them for possession of marihuana. When the women asked for some sort of identification, appellant said that he did not have any with him but that his real purpose was to arrest Steve Renick because he was a heroin dealer. Appellant told the women to cooperate, to stay in his sight all day long and not to talk to each other. He then had them go into Markham's bedroom. Appellant left the bedroom and shortly thereafter the women heard a breaking noise. They followed the noise and found appellant going through Renick's footlocker.

Appellant found Renick's gun inside the footlocker. Appellant pointed the gun at the women and told them he was going to handcuff one of them. He proceeded to handcuff Markham; he put Crawford into a closet. After a period of ten minutes, appellant opened the closet door. He had the gun in his hand and was nude from the waist down. Appellant stepped inside the closet, pointed the gun at Crawford's head and instructed her to removed her clothes. When Crawford replied that she would not and she had venereal disease, appellant backed out of the closet and shut the door.

A short while later appellant removed Crawford from the closet and led her into the dining room. There she saw Markham nude and blindfolded, lying face down on the floor with her hands cuffed behind her. Appellant told Crawford to remove all of her clothes except her underwear and to lie down beside Markham. After a few minutes, appellant forced Crawford to commit oral sodomy upon him. Thereafter, appellant again put the women in the bedroom. Crawford was put back into the closet while appellant raped Markham. Then appellant blindfolded both women and forced both of them to lay on the bed. He then proceeded to go through Markham's purse.

Appellant later permitted both women to get dressed. He instructed the women not to talk to each other and at a point during the day when he caught the women talking he took Crawford into her room and handcuffed her to her bed. At 3:15 p.m., Markham's son returned home from school. Appellant made him go to his mother's room and remain there. Around 6:00 p.m., Renick came home. Appellant, carrying the gun and a pair of handcuffs, met Renick at the front door. Renick was immediately handcuffed and led into Markham's bedroom. Appellant told Renick that he was a narcotics agent and was arresting him. Appellant took Renick's wallet and then moved Renick into Crawford's bedroom where he was handcuffed to the bed. Over the next few hours appellant

12

moved through the house, shuffling his prisoners from room to room. Throughout the evening appellant made numerous threats to kill them all. At one point appellant led Crawford into the living room and had her sit on the couch. Appellant left the room and when he returned he was carrying a butcher knife. He stabbed Crawford in the stomach and then dragged her into a bathroom. A short time later, he had both women go back into the living room. There he told them he was a hit man and had a contract out for each of them. Appellant then took Crawford into the third bedroom. By this time Crawford was bleeding heavily, was in intense pain, and was passing in and out of consciousness.

Appellant brought Markham into the room where Renick was now confined. By this time Renick's hands had been tied to the headboard and his feet had been bound together. Appellant proceeded to bind Markham by tying her hands behind her back, tying her feet together and then taking a wire and tying her feet to her hands. When Renick and Markham begged appellant to release them so that they could take Crawford to the hospital, appellant said he was a hit man and he was going to kill them all. Appellant left the room. Soon the victims began to smell gasoline. They could hear the appellant in the attached garage coughing and sputtering. After a while appellant came back into the bedroom carrying a Prestone antifreeze can and a rolled up newspaper. Appellant again told Markham and Renick that he was going to kill them all. He then left the room. The victims saw appellant backing down the hallway, pouring a liquid out of the antifreeze can. They soon began to smell gasoline. Suddenly, fire roared through the hallway and flames began shooting into the bedroom where Renick and Markham were tied up.

Renick managed to free himself, break a window and jump outside. He then tried to go back in and rescue Markham who was screaming but the flames were too intense. When the screaming stopped, he ceased his efforts. He then ran to the window of the bedroom in which Markham's son was sleeping. He was able to pull the child out of the window. Crawford, awake at the time of the fire's ignition, managed to jump out of a bedroom window. She ran next door to summon help. On her way to the neighbors, she saw appellant climbing into his car. She ran to the neighbors' house and rang the doorbell. The neighbors found her collapsed on the ground.

Emergency vehicles responded to the fire call at 1:14 a.m. When they reached the scene, the house was fully involved. Markham's body was found by fireman inside the house. Her hands and feet had been tied

13

behind her back, leaving her body in a crouched position. An autopsy showed that her hands and feet were tightly bound with insulated wire.

Police found a Prestone antifreeze container sitting just inside the doorway of the laundry room. It smelled heavily of gasoline. They also found two sections of garden hose on the floor of the garage lying next to a vehicle that had been parked in the garage. These also smelled of gasoline. A fire investigator concluded that more than two gallons of gasoline had been used to start the fire. He determined that the fire had been deliberately set." *Hogue*, 711 S.W.2d at 10-12 (footnote omitted).

The testimony, witness by witness, is described in greater detail in the district court's opinion. *Hogue v. Scott*, 874 F.Supp. at 1500-1511. Hogue testified at the guilt-innocence stage—though not at the punishment stage—and, as the district court observed, his rendition of the events "was virtually a reversal of the roles other witnesses assigned to Hogue and Renick." *Id*. at 1509. Hogue stated that Markham wanted to get Renick out of the house as white powder had been found in his footlocker and she thought he was dealing drugs. Consequently, when Renick returned to the house from work about 6:00 p.m. Friday, January 12, 1979, Hogue came up behind Renick and put his knuckle in Renick's back, making Renick think he had a gun, and under the threat of this imaginary gun forced Renick to lie down, and then handcuffed him.[9] He then took Renick to a bedroom, removed the handcuffs and re-handcuffed Renick to the bed. Later, after consulting with Markham and after Renick promised to leave, Hogue

---

[9] The state's evidence had shown that Hogue had purchased handcuffs on January 2, 1979. Hogue testified that he had bought them for a friend, but offered no explanation of why he still had them on January 12.

14

unhandcuffed Renick. Some time later, as Hogue and Markham were talking, Renick appeared with a pistol in hand and told them to go into a bedroom, which they did. Hogue then heard Crawford and Renick talking about dope, heard Crawford scream, and saw her run, bent over, into Renick's bedroom. Holding the gun on Markham and Hogue, Renick tied them up. Sometime later Renick untied Hogue and forced him to siphon gas out of a vehicle in the garage and put it in a Prestone antifreeze can and some milk cartons. Renick then told Hogue to spill the gas, Hogue refused, and Renick took him back to the bedroom, where Markham was tied, and retied him. Renick left the room. Later, Hogue smelled gas. He broke the bedposts to which he was tied and began untying Markham. Renick appeared in the door, Hogue kicked at him and missed, and his momentum carried him into the hallway; Renick "back[ed] off down the hall," and "brought the gun up." Hogue then ran out of the house. When he reached the street, he saw the house suddenly go up in flames. He thought he saw Renick standing at the side of the house. Hogue jumped in his car and drove off.

After a thorough review of the evidence, we are in full agreement with the district court's conclusion that Hogue's version of the events "when weighed against the other evidence in the case, is so lacking in credibility that no reasonable trier of fact would accept it." *Hogue v. Scott* at 1509.

Hogue was found by the police some twenty-four hours after the fire, shortly after 11:00 p.m. Sunday, January 14, 1979, alone in a friend's small upstairs apartment, which was totally dark,

15

hiding, fully clothed, in the shower stall behind the closed shower door in the bathroom. Though the police had announced their presence and stated they were looking for Hogue, he had remained wholly silent and hidden. Hogue knew the police were looking for him, and he had made no attempt to contact them (or the fire department or emergency medical services or any other authority). He gave no explanation for this. Hogue has offered no explanation for the testimony of Markham's son—called as a witness by Hogue—that Hogue held a pistol on Markham and Crawford before Renick returned from work late Friday afternoon, January 12, then went to the front door with the gun when Renick's truck was heard to drive up, stated to Renick "I am arresting you for selling marijuana," and returned with the gun and with Renick handcuffed, after which Renick was handcuffed to the bed. The boy also testified that Renick removed him from the burning house. The two neighbors testified as to Crawford and Renick's fleeing to their house, Renick's desperate efforts to save Markham and the boy, Crawford's anguish at their fate and her spontaneous statements to each of the neighbors concerning her near fatal stabbing by Hogue: "I don't know why he stabbed me. I don't know why he did it. I don't know him," and "I don't understand why he did this to me. I don't even know him." It was clearly established and undisputed that Crawford and Renick had known each other well over a year prior to the events in question, while prior thereto she and Hogue were total strangers each to the other. Similarly, Crawford's and Renick's statements to the neighbors, and to the police who shortly

16

arrived, were excited utterances and were consistent with their trial testimony, which was also corroborated by their physical condition (e.g., Renick's arms were cut and bleeding, his hair and beard were singed, and he had no shoes on; Crawford was suffering a near-fatal stab wound) and actions then as testified to by other witnesses, including the police and the neighbors.

*Prior Conviction Impeachment*

In cross-examination of Hogue (at the guilt-innocence stage), the state was permitted to ask him, for impeachment purposes only, whether he had been convicted in September 1974 for rape in Colorado in cause No. 6785, to which Hogue replied "I plead guilty to a fourth class felony of rape, yes, sir" and went on to state that he had served ninety days of his three-year sentence (he subsequently admitted he had later served an additional sixty days of that sentence).[10]  Defense counsel objected on the sole ground that under Texas "Code of Criminal Procedure[s] [art.] 38.29" the conviction "is not a final conviction."[11]  Just before Hogue took

---

[10]     On redirect of Hogue, defense counsel brought out that the victim in the 1974 offense had been his "ex-wife" (nothing else then before the jury so suggested) and the offense was "a fourth class felony."
     The 1974 rape conviction had also been used for impeachment of Hogue during cross-examination at his first trial.

[11]     Former Tex. Code Crim. Proc. art. 38.29 (which was repealed in 1986 and replaced by Tex. Rules Crim. Evidence, Rules 608, 609) provided in relevant part:

> "The fact that a defendant in a criminal case, or a witness in a criminal case, is or has been, charged by indictment, information or complaint, with the commission of an offense against the criminal laws of this State, of the United States, or any other State shall not be admissible in evidence on the trial of any criminal case

17

the stand, defense counsel in a hearing out of the presence of the jury had unsuccessfully sought to preclude cross examination of Hogue in respect to this conviction on the ground that the conviction was not final, because Hogue's sentence was probated and probation had been completed. In support, defense counsel placed before the court as Defendant's Exhibit A (which the court admitted for purposes of the hearing on admissibility of the conviction) the record of the proceedings in Colorado cause No. 6785, reflecting that: Hogue was charged in an eight-count information filed May 6, 1974, count three of which alleged rape on May 3, 1974, of Claudia Hogue;[12] on August 19, 1974, Hogue, represented by counsel Hilgers and "[a]fter being advised of his rights as provided under Rule 11," pleaded guilty to the rape count, the two then-remaining other

---

for the purpose of impeaching any person as a witness unless on trial under such indictment, information or complaint a final conviction has resulted, or a suspended sentence has been given and has not been set aside, or such person has been placed on probation and the period of probation has not expired."

Texas courts have held that this statute precludes impeachment of a witness by a prior conviction, the sentence for which was initially probated and the probation term has expired unrevoked. *See Wintters v. State*, 616 S.W.2d 197, 200-201 (Tex. Crim. App. 1981); *Thomas v. State*, 578 S.W.2d 691, 699 (Tex. Crim. App. 1979); *Redman v. State*, 533 S.W.2d 29, 32 (Tex. Crim. App. 1976). Such a conviction is said not to be final. *Trippell v. State*, 535 S.W.2d 178, 180 (Tex. Crim. App. 1976). However, if "the witness represents himself as a law-abiding citizen" and "denies he has ever been convicted," the conviction may be shown (despite successful completion of probation). *Id.* at 181.

[12] The other counts were kidnaping Claudia Hogue, kidnaping Shawna Hogue, two counts of assault on Shawna Hogue, two counts of theft from Claudia Hogue, and witness intimidation of Shawna Hogue, all on May 3, 1974. On July 10, 1974, five of the eight counts were dismissed on the prosecutor's motion, the Claudia Hogue kidnaping was reduced from first to second degree kidnaping, and preliminary hearing was waived.

18

counts (second degree kidnaping and theft over $100) in cause No. 6785 were dismissed (as were all the four other pending informations against Hogue, Nos. 6534, 6322, 6324 & 6325); on September 23, 1974, Hogue was sentenced to three years on the rape conviction, and the court denied probation; on November 27, 1974, Hogue, through counsel Hilgers, filed a motion to modify the sentence based on "very favorable reports" from the prison (reformatory), copies of which were filed with the motion; on December 23, 1974, the Colorado court, reciting that it had "read the recommendations from the reformatory," granted the motion to modify and placed Hogue on probation for a two-year period; on April 24, 1975, the probation department filed a complaint charging that Hogue had violated his probation in four respects; on April 28, 1975, Hogue, represented by counsel Truman, pleaded not guilty to the probation violation complaint; another probation violation complaint was filed by the probation department on August 6, 1975, alleging August 3, 1975, law violations (sexual assault and burglary); on November 10, 1975, attorney Gray appeared for Hogue (apparently not the same Gray who later represented him on direct appeal of his 1980 conviction); on November 24, 1975, the August 6, 1975, probation complaint based on violation of law was withdrawn; on December 8, 1975, Hogue, represented by Gray, pleaded guilty to and was found guilty of probation violations in cause No. 6785, the three-year sentence in that cause was reimposed, and Hogue was ordered to the state penal institution, with credit for 91 days served there and for 125 days in local confinement (two other

19

criminal cases against Hogue, Nos. 7638 and 7487, were also then dismissed); on February 9, 1976, Hogue, through Gray, moved to modify the sentence in No. 6785 by placing Hogue on probation; on March 1, 1976, the Colorado court granted that motion and ordered that "the balance of" Hogue's "sentence" be suspended and that he be released from custody and placed on probation for a period to expire December 23, 1976; on January 6, 1977, the Colorado court ordered the probation supervision discontinued and terminated the No. 6785 proceedings against Hogue because the period of his probation had expired.[13]  None of this evidence was placed (or sought to be placed) before the jury.

Defense counsel's motions *in limine* had sought to establish with respect to this 1974 Colorado rape conviction that "the Defendant was placed on probation which probation was successfully completed and terminated on the 6th day of January, 1977."  At argument before the court, out of the presence of the jury, counsel contended, after the court had indicated that it would allow Hogue to be impeached by the prior conviction, "our objection to the court's ruling comes from Code of Criminal Procedure 39.29 [sic], where it says in that Article, that," and counsel then read from Tex. Code Crim. Proc. art. 38.29 (quoted in note 11, *supra*),

---

[13]    On September 7, 1976, the Colorado probation department had filed a complaint alleging that Hogue violated his probation, citing a Texas grand jury indictment charging Hogue with committing rape on August 2, 1976; on January 6, 1977, the Colorado probation department moved that the September 7, 1976, complaint be withdrawn because the rape charge was "dismissed January 4, 1977, as the victim refused to testify" and that supervision be terminated "as his [Hogue's] period of probation had expired."

concluding with the language thereof indicating that a probated sentence was not admissible for impeachment unless "the period of probation has not expired." Counsel went on the argue that the Colorado records showed that Hogue's "probation was terminated by the court on January the 5th, 1977" and "[w]e would take exception to the Court's ruling based upon Article 38.29 and on Defendant's Exhibit A that has been admitted before the court." The court ruled that the prior conviction was admissible as impeachment because Hogue's sentence was not originally probated and he served time under that sentence in the state penal institution, and also because when his sentence was later first probated that probation was revoked and he again served time in the state penal institution under the original sentence. The trial court also instructed the jury, in its charge at the guilt-innocence stage, that the prior conviction evidence "cannot be considered by you against the defendant as any evidence of his guilt in this case" and "was admitted before you for the purpose of aiding you, if it does aid you, in passing upon the weight you will give his testimony, and you will not consider the same for any other purpose."[14] There was no objection to this instruction, nor any request for other or

---

[14] Notwithstanding this instruction, defense counsel argued to the jury at the guilt-innocence stage that "I know one thing, of course, as soon as NCIC got a hit on Jerry Hogue with a rape conviction, it would appear that there was no more investigation in connection with Steve Renick. I think the evidence would be clear on that. Maybe that's the reason that there wasn't any better job done, as far as the crime-scene search out there, I don't know," and continuing about the investigation for several sentences.

further instructions in that respect.[15]

*Sentencing Evidence*

The testimony at the punishment phase is outlined, witness by witness, in the district court's opinion. *Hogue v. Scott*, 874 F.Supp. at 1509-1511.

The prosecution commenced by introducing a copy of the September 23, 1974, Colorado court judgment convicting Hogue of rape, based on his guilty plea, and sentencing him to confinement

---

[15] On direct appeal, Hogue's sole argument respecting the Colorado conviction was that "the trial court erred in allowing the State to impeach appellant with a non-final conviction during the initial proof stage of the trial." This argument was based entirely on the fact that the Colorado records introduced by the defense at the motion *in limine* hearing "show that Appellant successfully completed his probation and an order was entered dismissing the case," and "[t]he State, therefore, violated Article 38.29 of the Texas Code of Criminal Procedure (1965) in impeaching Appellant with the non-final conviction" because under Article 38.29 a conviction is not a final conviction admissible for impeachment if the sentence is probated unless "probation [has] not expired." The Court of Criminal Appeals rejected this contention. *Hogue*, 711 S.W.2d at 15-16. The court stated "the situation presented in the instant case is not the type envisioned by the drafters of Article 38.29," noting that when Hogue was initially sentenced probation was expressly denied and he served some time before the sentence was modified to provide for probation, a modification which resulted not from his preconviction record but rather from his post-conviction conduct at the Colorado State Reformatory. *Id*. at 15. The Court of Criminal Appeals particularly emphasized the fact that on December 8, 1975, Hogue's initial probation was revoked, the original (unprobated) three-year sentence was reimposed, and Hogue was again confined pursuant thereto, and when, on March 1, 1976, Hogue was granted probation a second time, only "the 'balance' of appellant's sentence" was probated, so that his incarceration (pursuant to the conviction) "between December 8, 1975 and March 1, 1976 was never affected by the second probation order," and "[t]his second probationary period may be likened to what we in Texas know as parole or mandatory supervision." Thus, for purposes of article 38.29 the Colorado conviction was final at least by "December 8, 1975, when appellant's first probation was revoked and he was incarcerated." *Id*. at 16.

22

for an indeterminate term not to exceed three years. Out of the presence of the jury, the state had previously announced its intention to offer this evidence, and Hogue, personally, had stated "I have no objection," as did also defense counsel. At no point in the trial was any objection ever made to this evidence; nor was any such objection ever urged on appeal.[16]

---

[16] There was nothing inconsistent between the defense objection to impeaching Hogue by cross-examining him concerning this conviction, on the ground that such was prohibited by Tex. Code Crim. Proc. art. 38.29 as the conviction was non-final since sentence had been probated and the probation completed, and the non-objection to introduction of the conviction at the sentencing phase of trial. Unlike instances governed by Article 38.29, which is directed to witness impeachment (Hogue did not testify at the sentencing stage), under Tex. Code Crim. Proc. art 37.07, sec. 3(a), the statute generally applicable to evidence at the punishment stage, "*any* probated or suspended sentence which has occurred prior to trial and whether successfully completed or not may be known to the judge or the jury assessing punishment." *Glenn v. State*, 442 S.W.2d 360, 362 (Tex. Crim. App. 1969)(emphasis in original). *See also Moon v. State*, 509 S.W.2d 849, 850-51 (Tex. Crim. App. 1974)(same). Tex. Code Crim Proc. art. 37.071(a), governing capital sentencing procedures, was (and is) even less restrictive respecting evidence which may be admitted at the punishment phase of a capital case, providing that "evidence may be presented as to any matter that the court deems relevant to sentence." As the Court of Criminal Appeals has frequently held, "[n]othing in Article 37.071, supra, requires that there be a final conviction for an extraneous offense to be admissible at the punishment phase." *Garcia v. State*, 581 S.W.2d 168, 169 (Tex. Crim. App. 1979). *See also Brooks v. State*, 599 S.W.2d 312, 322 (Tex. Crim. App. 1979)(same), *cert. denied*, 101 S.Ct. 3146 (1981), *reh. denied*, 102 S.Ct. 25 (1981), *reh. denied*, 103 S.Ct. 1490 (1982); *Hammett v. State*, 578 S.W.2d 699, 709 (Tex. Crim. App. 1979)(same), *cert withdrawn*, 100 S.Ct. 2905 (1980). Indeed, under Article 37.071(a), a defendant's confession to completely unrelated offenses is admissible at the punishment stage. *See, e.g., Hammett* at 709. Thus, even if the objection made to use of the prior conviction for impeachment at the guilt-innocence stage (that under Article 38.29 the conviction was inadmissible as non-final because sentence had been probated and the probation completed) had been good (which it was not), nevertheless that would not have been a valid objection to evidence of the prior conviction at the punishment phase.

23

Lieutenant Detective Diezei of the Boulder, Colorado Police Department, who had been with that organization some fifteen years, testified that in that capacity he had occasion to know that Hogue's reputation in that community for being a peaceable and law-abiding citizen was bad, and that he first heard about Hogue "in approximately 1970."

Sara Sampson testified that she was "from out of state," that she knew Hogue, having first met him "about ten years ago," and that in the community in which she knew him his reputation for being a peaceable and law-abiding citizen was bad. On cross-examination, Sampson identified certain photographs as being of Hogue, his ex-wife Claudia, and his daughter Shawna.

Karen Hightower testified that on July 25, 1976, when she was living in an apartment in Richland Hills and was going through a divorce, she met Hogue in the apartment building parking lot when her car wouldn't start and he offered to help, loaning her jumper cables. Subsequently, she went out with him. She later told Hogue she did not want to see him anymore, and he got angry. Thereafter, on August 2, 1976, Hogue telephoned her, stated that he wanted "for us to part friends," and asked her to go with him to get a hamburger and meet his uncle, who Hogue said was expecting them. Not wanting to hurt his feelings, she accepted, and they went in Hogue's car to get a hamburger and then drove into the country, supposedly towards the uncle's house. Hogue stopped the car, pulled a long knife, grabbed Hightower, threatened to kill her, made her commit sodomy, and raped her twice (there was no

24

ejaculation). On cross-examination, she admitted that the rape case growing out of this incident was no longer pending as, following a mistrial therein, she "chose not to go through a retrial."[17] Cross-examination also revealed that Hightower had been convicted of fraud in 1978 and that her exhusband had custody of her daughter.

The prosecution's final punishment stage witness was psychiatrist Dr. Grigson (also spelled in the record as Gregson). Dr. Grigson had not examined or interviewed Hogue, or examined any records or the like pertaining to him. In response to a lengthy hypothetical question (occupying some 192 lines in the record), which set out hypothetical circumstances paralleling the circumstances of the instant offense and those immediately leading up to it as reflected by the prosecution's evidence (some 177 lines), and also mentioned a previous rape conviction (2 lines), and a rape such as discussed by Karen Hightower (11 lines), Dr. Grigson testified that a person so described "certainly would present very much of a continuing threat to society," and would be such even if confined in a penal institution. Cross-examination was almost entirely focused on what defense counsel asserted was the impropriety of predicting future dangerousness, especially solely on the basis of a hypothetical question, on asserted professional criticism of Dr. Grigson for doing so, and on his

---

[17] Evidence at a motion *in limine* hearing, but not put before the jury in this case, indicates that in the rape prosecution growing out of this incident a mistrial was declared when the jury in that case could not reach a verdict.

25

frequent testifying and related remuneration. No counter-hypotheticals were posed to Dr. Grigson.

The defense put on psychologist Dr. Dickerson. He, too, had not examined or interviewed Hogue, or examined any records or the like pertaining to him. The bulk of Dr. Dickerson's testimony was that future dangerousness could not be predicted, and that such predictions were wrong two out of three times; that it was especially improper to so predict without examination of the individual concerned and solely on the basis of a hypothetical question; and that a committee of the American Psychiatric Association had condemned that practice. On cross-examination by the state, Dr. Dickerson was unwilling to state that future dangerousness could be predicted for anybody, no matter what they had done in the past. A person's past dangerousness, no matter how clearly evidenced, simply did not justify predicting future dangerousness. Subsequently, Dr. Dickerson was recalled by the defense, and based on a hypothetical[18] testified that the Parole Board was very reluctant "to grant parole to someone with a history of that sort." Apart from this statement, Dr. Dickerson gave no testimony about Hogue personally or by hypothetical. On cross-examination by the prosecution, Dr. Dickerson admitted that probably a majority of murderers who receive life sentences are

---

[18]     Defense counsel's hypothetical related to "a crime where there has been a woman who was, say, forced to commit oral sex, and there is another women who was raped, and she was tied up and the house set fire where there were three other people present, and the person died; the person who committed that act was also found guilty of rape; and, he was further charged with rape."

26

granted parole.

The remaining defense punishment phase witnesses were Becky Hogue and Mary Ebel. Becky Hogue testified that she had known Karen Hightower "since about '72 or '76" and that her reputation for being a truthful person was very bad.

Mary Ebel testified that Hogue was her youngest son, and she identified three photographs as being of Hogue, his ex-wife Claudia, and his daughter Shawna.[19] Ebel testified that Claudia was "the injured party in the rape case that sent Jerry to the Colorado State Reformatory," that the pictures were taken at that Reformatory "around January of '76" while Hogue was there "after he had already plead guilty and been sent to the Colorado state Reformatory." Ebel said she took Claudia to visit Jerry in the Reformatory because Claudia "has no other way to go." This was Ebel's only testimony at the punishment stage. The prosecution did not cross-examine her. The three pictures were introduced in evidence. In one, Claudia and Hogue are sitting right next to each other (their bodies touching), Hogue's arm around Claudia and young Shawna sitting apparently half on the lap of each; in another, Hogue is standing holding Shawna on his right and Claudia is on his left and slightly behind him with both her arms around him; the remaining picture shows Claudia and Hogue standing next to each other (their bodies touching) and does not include Shawna. In each picture all the subjects are smiling.

_____

[19]     Sampson had likewise identified the people in these pictures as being Hogue, his ex-wife Claudia, and his daughter Shawna.

The jury was instructed that in answering the punishment issues it could consider the evidence introduced at the guilt-innocence stage of the trial, as well as that introduced at the punishment stage.

## DISCUSSION

### I. Admission of Colorado Conviction at Sentencing

The first of the three issues raised by Hogue on this appeal is stated in his appellant's brief as follows: "Did the admission of Mr. Hogue's invalid prior felony conviction from Colorado at the sentencing phase of his Texas capital murder trial violate the Eighth and Fourteenth Amendments under *Johnson v. Mississippi*, 486 U.S. 578 (1988), and was he harmed by the violation?"[20] Hogue does not argue (and did not argue below) that any invalidity in his 1974 Colorado conviction renders his Texas capital murder *conviction*

---

[20] Similarly the Summary of Argument in Hogue's appellant's brief states that his first issue "concerns the admission, at the punishment phase of Mr. Hogue's capital murder trial, of a constitutionally invalid and factually unreliable prior felony conviction."

Of the thirty-five grounds of relief alleged in Hogue's instant section 2254 petition and amended petition below, the only one asserting or relying on any invalidity of the Colorado conviction is the seventeenth ground for relief, which states: "The admission of Mr. Hogue's void prior conviction at the sentencing phase violated rights guaranteed by the U.S. Constitution."

Hogue never presented any such claim to the Texas courts except in his sixth Texas habeas, which the Court of Criminal Appeals on March 16, 1992, refused to take action on because of Hogue's abuse of the writ, which it had previously found in its September 18 1991, order denying Hogue's fifth state habeas. Of the thirty-six grounds for relief asserted in Hogue's sixth state habeas, the only one asserting or relying on any invalidity of the Colorado conviction is the thirty-first ground, which states: "The admission of Mr. Hogue's void prior conviction at the sentencing phase violated rights guaranteed by the U.S. Constitution."

28

subject to attack under the Constitution or laws of the United States (or, indeed, in any way now subject to attack).[21] Consequently, we do not consider any such question.[22]

*Colorado Court 1994 Action*

In late December 1992, some seven months after the instant section 2254 petition was filed, Hogue, through counsel, commenced proceedings in the Colorado trial court in which he had been convicted, on the guilty plea, of rape in September 1974, to set that conviction aside. In an order entered June 6, 1994, the Colorado court (a judge who had not previously been involved in Hogue's case) set aside Hogue's 1974 conviction (cause No. 6785), finding that Hogue's then counsel, Hilgers, had rendered constitutionally ineffective assistance. A copy of the Colorado court's order and memorandum opinion was filed with the district court below on June 7, 1994.[23]

---

[21]    Nor did he ever present or seek to present any such issue to the Texas courts.

[22]    Even if the question had been raised (and exhausted), we would find Hogue not entitled to relief, essentially because such a claim would be procedurally defaulted by the failure to object at trial on the basis of any claimed invalidity in the Colorado conviction, and in any event because the impeachment of Hogue with reference to the conviction did not substantially influence the jury's guilty verdict.

[23]    The State of Colorado appealed the Colorado trial court's order on July 18, 1994, but moved to dismiss its appeal on September 7, 1994. The motion to dismiss recites that "there are serious, legitimate and complicated legal issues" involved, including: the delay in bringing the attack on the conviction; "the fact that the defendant [when he pleaded guilty in 1974] faced numerous serious charges and his attorney arranged a plea agreement under which all but one charge was dismissed and under which the defendant received a minimal sentence of incarceration;" and that defendant's pending Texas death sentence "permeated the

29

The Colorado trial court's order, invoking the standards of *Strickland v. Washington*, 104 S.Ct. 2052 (1984), and *Hill v. Lockhart*, 106 S.Ct. 366 (1985), found that Hogue's counsel, Hilgers, rendered Hogue ineffective assistance in connection with his August 19, 1974, plea of guilty to rape in cause No. 6785.[24] This determination was based on findings that Hilgers, an attorney licensed in 1972 (and disbarred in 1980) who had never tried a felony case, "conducted no investigation and talked to no witnesses, other than talking to the defendant" and waived a preliminary hearing, all without any "reasonable tactical purpose." Hilgers had Hogue take a polygraph test, the results of which were adverse to Hogue. The Colorado court found that "[b]efore the

consideration of" the motion to set aside the 1974 conviction. The concluding paragraph (just before the formal request for relief) of the motion to dismiss the appeal states: "Although the People continue to believe that the order below includes substantial legal errors and that continuing this appeal would be legitimate and appropriate, the People have also concluded that other aspects of this case cloud the issues so that it is not in the public interest to pursue this appeal." The appeal was dismissed by the Colorado Court of Appeals on September 27, 1994, by the notation "granted" being then stamped on the first page of the State of Colorado's motion to dismiss the appeal.

[24] Hilgers also represented Hogue in four other Colorado criminal causes brought against him; Nos. 6322, 6325, and 6534 were felony menacing charges (No. 6534 also including second degree kidnaping) in each of which Claudia Hogue was the complainant, and No. 6324 charged theft. Nos. 6322, 6324 and 6325, were put on "deferred prosecution" in October 1973, which the Colorado court described as "the most lenient possible" disposition "[s]hort of outright dismissal." Each of these four cases—as well as the then remaining two other counts (second degree kidnaping of Claudia Hogue and theft) in cause 6785—were dismissed as part of the plea agreement on August 19, 1974, when Hogue pleaded guilty to the rape count in No. 6785. On July 10, 1974, the other five counts in No. 6785 had been dismissed, the Claudia Hogue kidnaping count had been reduced from first degree to second degree kidnaping, and preliminary hearing was waived.

30

polygraph exam, he [Hilgers] believed the defendant's version of the facts, and expected that the polygraph would establish the defendant's innocence," but that "[a]fter receipt of the polygraph results shortly after June 28, 1974," Hilgers became "panicky" and decided to dispose of the case "at almost any cost, because he had faith in the polygraph and no longer believed his client." Subsequently, the prosection made the offer to Hilgers on the basis of which Hogue ultimately pleaded guilty (see note 24, *supra*), Hilgers communicated the offer to Hogue, and "took the position that the defendant must accept the offer because Mr. Hilgers felt there was a substantial likelihood of conviction." However, Hilgers "was focused primarily on his own desire to avoid trial," "his advice was not based on an informed judgment," and "his recommendation was not the product of an intelligent choice among reasonable alternative courses." Hogue "reluctantly accepted the advice from Mr. Hilgers, although, to this date, he has always maintained his innocence." The Colorado court concluded that "there is a reasonable probability that, if competent counsel had developed the facts, he or she would not have recommended a guilty plea and the defendant would not have pled guilty" and that "there was a reasonable probability that at a trial on the charge the defendant would have been acquitted."[25]

---

[25] The court based this conclusion in part on the testimony of attorney Hale (who had been the prosecutor in cause No. 6785, as well as in No. 7304, another charge of rape and felony menacing of Claudia Hogue and robbery of Sara Sampson of which Hogue was acquitted in a later jury trial), that "he believed there was a reasonable probability of acquittal." The court accepted his testimony as creditable, although noting Hale's "opposition to the

The Colorado Court, however, did not find that no competent counsel would have advised Hogue to plead guilty. The court stated it was "not unmindful of the prosecution's argument that, in the context of the plea bargain package, the defendant can be said to have done quite well. However, the issue is not that, but whether this rape conviction is valid. And what is important is not outcome alone."[26] The court also remarked, in reference to cause No. 7304, in which Hogue was later acquitted, "[o]f course, there was less at risk in that case than there was for the defendant here [in No. 6785]." Nor did the Colorado court find that Hogue was in fact innocent of the rape charge in cause No. 6785. It stated that "[t]he Court has no way of knowing whether Claudia Hogue's allegations in this case were true. And the Court does not mean to demean her in any way by this ruling."

At the end of its opinion, the Colorado trial court stated

---

death penalty" and that "Hale recognized his biases and explained how he struggled to exclude their contaminating affect from his testimony." The court also relied on the acquittal in cause No. 7304 and on the fact that cause No. 7487, which alleged that on April 3, 1975 Hogue sexually assaulted and burglarized Claudia Hogue, was dismissed by Hale on December 8, 1975 because Hale "thought she [Claudia] had lied" at the preliminary hearing in that case.

[26] All other pending charges against Hogue (including two kidnaping and three felony menacing charges) were dismissed and he received a three-year sentence of which he served only ninety-one days until, on the motion of his attorney Hilgers, he was granted probation; after that probation was revoked (on Hogue's guilty plea to probation violation while represented by attorney Gray), Hogue served some eighty-two more days until his sentence was again probated, after which he served no further time thereunder. The charge of rape as a class four felony exposed Hogue to a maximum sentence of ten years, as also did each of the two second degree kidnaping charges. *See* Col. Rev. St. (1973) §§ 18-1-105, 18-3-302.

32

"[f]urther, because the defendant was ineffectively represented at the plea hearing, his plea is invalid under *Boykin* [*v. Alabama*, 89 S.Ct. 1709 (1969)], as well." This constitutes the Court's only discussion of *Boykin*, and the opinion contains no recitation of facts relevant to *Boykin*, as distinguished from *Strickland* or *Hill*.[27] There is no suggestion the court taking Hogue's guilty plea did not personally advise him on the record, and in open court in the presence of his counsel, of all his relevant constitutional rights, of the elements of the offense, and of the range of punishment to which his plea exposed him, and of every other constitutionally required matter.[28] Nor is there any finding that

---

[27] *Boykin*, a guilty plea direct appeal case, concerned the failure of the record to reflect that the court advised the defendant of his privilege against compulsory self-incrimination, his right to trial by jury, or his right to confront his accusers, the Supreme Court observing "[w]e cannot presume a waiver of these three important federal rights from a silent record." *Id*. at 1712. The court had previously noted that "[s]o far as the record shows, the judge asked no questions of petitioner concerning his plea, and petitioner did not address the court." *Id*. at 1710.

[28] The August 19, 1974, order accepting the guilty plea (and dismissing the other charges) recites that prior to pleading guilty Hogue (accompanied by counsel Hilgers) was "advised of his rights as provided under Rule 11." This was apparently on the record, as the Colorado court's 1994 order does not suggest otherwise and does recite "Mr. Gray did not examine the transcript of the August 19, 1974 providency hearing." The Colorado court's 1994 order makes no reference to the content of, or what is reflected by, the transcript of the August 19, 1974, hearing. Colorado Rule 11, as in effect when Hogue's plea was taken, provided in relevant part as follows:

> "The court shall not accept a plea of guilty or a plea of nolo contendere without first determining that the defendant has been advised of all the rights set forth in Rule 5(a)(2) and also determining:
> (1) That the defendant understands the nature of the charge and the elements of the offense to which he is pleading and the effect of his plea;

33

Hilgers had failed to advise Hogue, or had incorrectly advised him,

as to any of such matter. The Colorado court's 1994 order makes no

> (2) That the plea is voluntary on defendant's part and is not the result of undue influence or coercion on the part of anyone;
> (3) That he understands the right to trial by jury and that he waives his right to trial by jury on all issues;
> (4) That he understands the possible penalty or penalties;
> (5) That the defendant understands that the court will not be bound by any representations made to the defendant by anyone concerning the penalty to be imposed or the granting or the denial of probation, unless such representations are included in a formal plea agreement approved by the court and supported by the findings of the presentence report, if any;
> (6) That there is a factual basis for the plea. If the plea is entered as a result of a plea agreement, the court shall explain to the defendant, and satisfy itself that the defendant understands, the basis for the plea agreement, and the defendant may then waive the establishment of a factual basis for the particular charge to which he pleads:"

Colorado Rule 5(a)(2) as then in effect provided in relevant part:

> "At the first appearance of the defendant in court, it is the duty of the judge to inform the accused of and make certain that he understands the following:
> (I)  He need make no statement and any statement made can and may be used against him;
> (II)  He has a right to counsel;
> (III)  If he is an indigent person, he has the right to request the appointment of counsel or consult with the public defender before any further proceedings are held;
> (IV)  Any plea he makes must be voluntary on his part and not the result of undue influence or coercion on the part of anyone;
> (V)  He has the right to bail, if the offense is bailable, and the amount of bail that has been set by the court;
> (VI)  The nature of the charges against him;
> (VII)  He has the right to a jury trial;
> (VIII)  He has the right to demand and receive a preliminary hearing within a reasonable time to determine whether probable cause exists to believe that the offense charged was committed by the defendant."

reference to (or description of) anything that transpired or did not transpire at the August 19, 1974, hearing other than that Hogue then pleaded guilty and his plea was accepted. The court's *Boykin* conclusion appears to be nothing more than what it regarded as necessarily following from its finding that Hilgers, based on a professionally inadequate investigation, had erroneously advised Hogue that "there was a substantial likelihood of conviction" and thus "encourag[ed] the defendant to accept the plea bargain offer," but "did not give the defendant sufficient information to make an intelligent choice at the same time misleading the defendant to believe that he had," although "the investigated evidence" would have shown that "Hilgers had a winnable case for the defendant," and that there was a reasonable probability Hogue would otherwise not have pleaded guilty.[29]

The Colorado court also determined that Hogue's failure to attack his 1974 conviction until 1992 was within the Col. Rev. St. (1986) § 16-5-402(2)(d) "justifiable excuse or excusable neglect" exception to the otherwise applicable three-year limitation period for such attacks provided in Col. Rev. St. (1986) 16-5-402(1). The court concluded that although "there were no outside circumstances preventing an earlier challenge by Mr. Hogue's lawyers,"[30] and

---

[29] The court also found that Hilgers did not disclose to Hogue his inexperience and lack of preparation and investigation, but made no finding that any of these matters were misrepresented to Hogue.

[30] The Colorado court made a single exception for Ms. Crocker, who commenced representing Hogue in May 1991, because Hogue's case was complex and she was very busy with other Texas capital cases for the Texas Resource Center.

35

"[n]one of the material evidence has been destroyed," nevertheless "[w]hen the defendant's subsequent lawyers [those after Hilgers] did not make the claim now asserted, it is inconceivable that their failure can be characterized as the culpable neglect of the defendant."[31]

*District Court*

The district court below, in its November 1994 opinion, noted that Respondent (the State) had waived exhaustion, and accepted the waiver, though observing it was not bound to do so. *Hogue v. Scott* at 1512. The court accepted the Colorado court's 1994 determination that Hogue's 1974 rape conviction was constitutionally invalid, but held "there are multiple reasons" why the admission of evidence of that conviction at Hogue's sentencing did "not provide a meritorious ground for relief." *Id.* at 1516. The court held that Hogue's claim was procedurally barred

---

[31] The court did not find that any of Hogue's several attorneys had ever rendered him ineffective assistance of counsel (except Hilgers in respect to the August 1974 guilty plea to the rape count in No. 6785). The court did find that attorney Gray "had experience in making attacks on prior convictions" and when representing Hogue in December 1975 when he pleaded guilty to violating the initial probation of his rape sentence "made a reasonable tactical decision not to attack" the earlier rape conviction, and that attorney Coffee, who "had served as district attorney of Tarrant County from 1966 to 1971," in his representation of Hogue at his March 1980 trial "considered a challenge" to the 1974 rape conviction. The Colorado court applied the teachings of *People v. Wiedemer*, 852 P.2d 424, (Col. 1993) as to what constitutes "justifiable excuse or excusable neglect" under Col. Rev. St. § 16-5-402(2)(d). *Wiedemer* gives an inclusive and flexible meaning to those terms, *id.* at 440-443, and relies on the treatment in *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership*, 113 S.Ct. 1489 (1993) of "excusable neglect" as used in Bankruptcy Rule 9006(b)(1) and on *Pioneer's* characterization of "excusable neglect" as "a somewhat 'elastic concept.'" *Wiedemer* at 442 n.20. *See also id.* at 440-443.

because it was first raised in Hogue's sixth (and last) state habeas which the Court of Criminal Appeals refused to act on because of its previously having cited Hogue for abuse of the writ in its denial of his fifth state habeas, and Hogue had not shown either cause for this default or resulting actual prejudice. *Id.* at 1512-15, 1522. *See also id.* at 1545-56 (January 1995 order overruling post-trial motion). The district court further held that Hogue's claim in this regard was also independently procedurally barred by his failure to object at trial to the admission of the evidence, and that Hogue had not shown either any cause for this failure nor resulting actual prejudice. *Id*. at 1522-23. Finally, the district court concluded that under *Brecht* any error in the admission at sentencing of the Colorado conviction was harmless, noting that "the evidence, independent of the Colorado conviction, in support of the findings the jury made at the punishment phase of the trial was so forceful that the possibility of actual prejudice resulting at that phase of the trial from the mentions of the conviction is negated" and "[t]he mentions of the Colorado conviction did not have a substantial or injurious effect in determining the jury's verdict at either phase of the trial." *Id.* at 1521-22.[32]

---

[32] The district court also held that "[t]he evidence of guilt presented at trial was so overwhelmingly in favor of guilt that it negates any possibility of actual prejudice resulting to Hogue from the mentions of Hogue's Colorado conviction at that stage of the trial." *Id.* at 1521. As noted, this conclusion has not been challenged on appeal and we accordingly accept it; alternatively, even if it had been challenged, our examination of the record convinces us of its correctness.

*Abuse of the Writ*

In finding a procedural bar on the basis of abuse of the writ, the district court (*id.* at 1515) relied on our October 13, 1994, opinion in *Hicks v. Scott*, 35 F.3d 202 (5th Cir. 1994), which held that where a claim was raised only in a Texas habeas that the Texas Court of Criminal Appeals took no action on pursuant to an earlier finding of abuse of the writ, this constituted a procedural bar to consideration of that claim on federal habeas as "[t]he Texas courts have a history of regular application of the abuse of the writ doctrine."[33] However, on motion for rehearing in *Hicks,* the state apparently conceded that the abuse of the writ doctrine was not then followed with sufficient regularity in Texas to constitute a procedural default which would bar federal habeas relief, and on March 20, 1995, our original opinion in *Hicks* was withdrawn and a new unpublished opinion was issued in its stead which reached the same ultimate result but did not address the abuse of the writ issue. *Hicks v. Scott*, No. 94-10302, 5th Cir., March 20, 1995 (unpublished). On the same day, we held in *Lowe v. Scott*, 48 F.3d 873 (5th Cir. 1995), that because the Texas abuse of the writ doctrine "has not been regularly applied" it could not function as a procedural default to bar federal habeas review. *Id.* at 876. In *Lowe* we relied on the statement in the Court of Criminal Appeals'

---

[33] We cited *Ex parte Choice*, 828 S.W.2d 5 (Tex. Crim. App. 1992); *Ex parte Emmons*, 660 S.W.2d 106 (Tex. Crim. App. 1983); *Ex parte Stuart*, 653 S.W.2d 13 (Tex. Crim. App. 1983); *Ex parte Bilton*, 602 S.W.2d 534 (Tex. Crim. App. 1980); and *Ex parte Dora*, 548 S.W.2d 392 (Tex. Crim. App. 1977). The district court below, in addition to our October 13, 1994 opinion in *Hicks*, cited *Dora* and *Ex parte Carr*, 511 S.W.2d 523 (Tex. Crim. App. 1974).

opinion in *Ex parte Barber*, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App. 1994), *cert. denied*, 115 S.Ct. 739 (1965), that it would be sound policy to apply the abuse of the writ doctrine "in the future." Lowe at 876. The district court, however, did not have the benefit of our opinion in *Lowe* or of the withdrawal of our original opinion in *Hicks*.[34]

We agree with the district court's observation that it is "quite clear that Hogue has pursued a course of manipulating, and abusing, the writ process to the end of gaining additional time." *Hogue v. Scott*, at 1546. We likewise agree with the district court that Hogue has not shown cause for his abuse (either generally or with respect to the instant claim regarding the Colorado conviction). Accordingly, and given that Texas courts had unquestionably applied the abuse of the writ doctrine in other published opinions (*see, e.g.*, cases cited in note 33, *supra)*, the district court correctly observed that Hogue had "fair warning that he was running the risk of a ruling of abuse of the writ." *Id*. at 1545. Moreover, on Hogue's second trip to the district court below in which he had procured a last minute stay of execution, the Court on October 17, 1987, had advised Hogue to file by January 22, 1988, in federal *or* state court, a habeas petition presenting "each and every claim known to Petitioner or his counsel on pain of waiver." Further, there is nothing to suggest that the Court of Criminal Appeals' invocation of the abuse of the writ doctrine in Hogue's

---

[34] The state's concession on rehearing in *Hicks* came after the district court's original opinion in November 1994, but before its January 1995 denial of Hogue's Rule 59 motion.

case was any kind of ploy to avoid a difficult federal issue or was otherwise in any sense unfair.[35]  Nevertheless, that a state rule

---

[35]     Indeed, the Court of Criminal Appeals had cited Hogue for abuse of the writ before it was ever presented with any claim that his Colorado conviction was constitutionally invalid, a claim first made in his sixth state writ.  Even Hogue's sixth state writ does *not* fairly present this claim.  This sixth state writ asserts 36 grounds for relief in some 173 pages (exclusive of exhibits), and the asserted constitutional invalidity of the Colorado conviction is presented only in the 31st ground, which states "the admission of Mr. Hogue's void prior conviction at the sentencing phase violated rights guaranteed by the U.S. Constitution."   The discussion and argument under this claim (which is accomplished in less than a page and a half) does not mention ineffective assistance (or lack of assistance) of counsel or words equivalent thereto, the Sixth Amendment is not cited, and the only indication of the alleged defect in the Colorado conviction is the allegation:

> "Mr. Hogue's Colorado rape conviction is void.  It was obtained through reliance on false testimony and other violations of Mr. Hogue's rights under state and federal law.  *Napue v. Illinois*, 360 U.S. 254 (1959); *Boykin v. Alabama*, 395 U.S. 238 (1969); *Strickland v. Washington*, 466 U.S. 668 (1984)."

There are no even conclusory allegations in this sixth state petition or its exhibits of anything Hogue's lawyer, in connection with his plea of guilty to the rape charge, either failed to do or did.   Plainly, the present challenge to the Colorado conviction—that it was based on ineffective assistance of counsel who without adequate investigation advised Hogue that he would likely be convicted and should therefore plead guilty—was *not* fairly presented in Hogue's sixth state writ.  *See Graham v. Johnson*, 94 F.3d 958, 968-69 (5th Cir. 1996).
    In Hogue's fifth state writ (which the Court of Criminal Appeals found without merit and in connection therewith cited him for abuse of the writ), he had alleged as one of his grounds for relief that:

> "Petitioner was denied the effective assistance of counsel at the punishment, because counsel failed to adequately prepare by failing to investigate and develop facts about petitioner's background in an attempt to develop and present mitigating evidence that would call for a sentence less than death, or in opposition to the death penalty, in violation of petitioner's 5th, 6th and 14th Amendments to the United States Constitution."

Nothing in this writ application asserts that there was any

of procedural default be *regularly* applied—not merely applied somewhat more often than not—is essential in order for it to serve as a *per se* bar to otherwise available federal habeas relief, and, as we held in *Lowe*, the Texas abuse of the writ doctrine (as applied prior to 1994) does not meet this test.[36]  Accordingly, the Texas court's abuse of the writ ruling does not of itself suffice to bar Hogue from federal habeas relief.

*Failure to Object at Trial*

The district court held that Hogue's claim as to the admission at the sentencing phase of his trial of evidence of the Colorado conviction, because it was void due to Hogue's counsel's having rendered him ineffective assistance, was procedurally barred by his failure to object at trial to that evidence as required by the

---

invalidity in the Colorado conviction, that Colorado counsel did or said or failed to do or say anything or was in any way ineffective, or that there was any error in admitting evidence of the Colorado conviction.  In an affidavit attached to this petition, Hogue states "I pleaded guilty . . . [in the Colorado case] because I was concerned that if I put my ex-wife through a jury trial that it would affect her emotional state of mind, and the possibility of this affecting my daughter."  Also attached to this fifth state habeas petition were four other affidavits (by Hogue's mother, step-father, brother and sister-in-law, each virtually identical to the other), which likewise state "Jerry pleaded guilty to this offense because he expressed concern putting Claudia through a jury trial because of her emotional state of mind, and the possibility of this affecting his daughter."  None of these five affidavits state that Colorado counsel advised Hogue to plead guilty or that Hogue did so because of anything Colorado counsel said or did or failed to do or say; none state anything Colorado counsel  said or did or failed to do or say; none asserts that Hogue was innocent of the charge to which he pleaded guilty or that the Colorado conviction was invalid.

[36]     Applications following *Ex parte Barber* have been held regular and adequate to bar federal habeas relief. *See Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 115 S.Ct. 2603 (1995).

41

Texas contemporaneous objection rule. *Hogue v. Scott*, at 1522-23. As the district court correctly observed, "Hogue, both personally and through his counsel, expressly told the state trial judge that Hogue had no objection to the receipt into evidence at the punishment phase of the trial of proof of Hogue's Colorado conviction." *Id*. at 1522.[37] The district court further correctly

---

[37] Nor was any issue raised in this respect on direct appeal. The district court also noted that the only objection at trial to the cross-examination of Hogue, at the guilt-innocence stage, as to whether he had been so convicted (which was allowed for impeachment purposes only) was that the conviction was not final because the probated sentence had been completed and accordingly Tex. Code Crim. P. art. 38.29 prohibited its use for impeachment purposes (see notes 11 and 15 *supra)*, that under the Texas contemporaneous objection rule this did not suffice to preserve any claim that such use of the Colorado conviction was improper because the Colorado conviction was void since Hogue was denied the effective assistance of counsel, and that accordingly any such claim was procedurally barred on federal habeas. *Id*. While the propriety of the cross-examination of Hogue in this respect at the guilt-innocence stage (he did not testify at the punishment stage) is not before us, even if it were, we would agree with the district court in this respect. We note that the Texas contemporaneous objection rule has consistently barred consideration of an objection to evidence on a ground not asserted at trial even though the evidence was then objected to on another ground (as well as barring consideration of an objection to evidence where no objection was made at trial). The following is but a minute sample of the multitude of cases so holding, *viz*: *Long v. State*, 823 S.W.2d 259, 270 n.15 (Tex. Crim. App. 1991), *cert. denied*, 112 S.Ct. 3042 (1992); *Sharp v. State*, 707 S.W.2d 611, 618-19 (Tex. Crim. App. 1986), *cert denied*, 109 S.Ct. 190 (1988); *Simpkins v. State*, 590 S.W.2d 129, 135 (Tex. Crim. App. 1979); *Williams v. State*, 531 S.W.2d 606, 607 (Tex. Crim. App. 1976); *Foreman v. State*, 505 S.W.2d 564, 566-67 (Tex. Crim. App. 1974). We have clearly held that such a procedural default bars federal habeas relief. *See, e.g.*, *Sharp v. Johnson*, 107 F.3d 282, 285 (5th Cir. 1997); *Nichols v. Estelle*, 556 F.2d 1330, 1331 n.5 (5th Cir. 1977), *cert. denied* (1978)(contention that prior Oklahoma conviction, introduced at Texas trial, was void because of denial of appellate counsel, was barred by procedural default where objection made at trial was not on this ground).
    We further note that even if the objection on grounds of lack of finality for purposes of Tex. Code Crim. P. art. 38.29 (due to completed probation) to the use of the Colorado conviction for

42

determined that "Hogue has made no plausible suggestion of a valid cause for his failure to timely object on the ground that his Colorado conviction was invalid." *Id*. at 1523.

Hogue challenges the district court's invocation of failure to comply with the Texas contemporaneous objection rule as a procedural bar on essentially three grounds.

First, Hogue makes a brief, passing assertion that this was not adequately raised by the state below. We disagree. In its supplemental answer filed below on July 7, 1994, the state specifically and adequately pleaded the procedural bar arising from Hogue's failure to object at trial as required by the Texas contemporaneous objection rule (citing pertinent Texas and federal authority).[38]

---

impeachment at the guilt-innocence stage had been valid and/or sustained (and it was neither), that would *not* have precluded (or rendered erroneous) introduction of the Colorado conviction at the sentencing phase, as is fully explained in note 16, *supra*. Conversely, the objection now urged (that the Colorado conviction was invalid because Hogue was not afforded effective assistance of counsel) is in no way and to no extent dependent on the validity (factually or legally) of the objection made on grounds of lack of finality (due to completed probation) for purposes of Article 38.29.

[38]    While it is clear that here the state adequately raised below the procedural bar arising from Hogue's failure to object as required by the Texas contemporaneous objection rule, we also note in passing that we have stated "[a]lthough the state may not have adequately raised the *Sykes* procedural default claim in the district court, that court itself addressed the issue, and barred relief thereunder. Consequently, this Court may sustain the decision below on *Sykes*," *Webb v. Blackburn*, 773 F.2d 646, 651 n.6 (5th Cir. 1985), and "waiver can be averted by the state if the issue of a *Sykes* procedural default is raised at any point in the district court proceedings. Here the district court addressed the issue of procedural default; we may therefore do so." *Wiggins v. Procunier*, 753 F.2d 1318, 1320 (5th Cir. 1985).

Second, Hogue argues that the Texas contemporaneous objection rule is (or was) not "'strictly or regularly followed,'" as is required for a default thereunder to bar federal habeas relief, *Johnson v. Mississippi*, 108 S.Ct. 1981, 1987 (1988), or at least that it is (or was) not so followed with respect to this character of claim. We reject this contention.

The Texas contemporaneous objection rule was already well established as long as thirty-five years ago, *see, e.g., Freeman v. State*, 357 S.W.2d 757, 758 (Tex. Crim. App. 1962),[39] and for more than twenty years we have on numerous occasions invoked noncompliance with it as a basis on which to deny federal habeas relief. And, on several occasions we have expressly held that it was followed with sufficient regularity for this purpose. In denying habeas relief on this basis in *St. John v. Estelle*, 544 F.2d 894, (5th Cir. 1977), we observed that "Texas' contemporaneous objection rule furthers a valid state interest." *Id*. at 895. This opinion was adopted by the en banc court with the addition of a citation to *Wainwright v. Sykes*, 97 S.Ct. 2497 (1977). *St. John v. Estelle*, 563 F.2d 168 (5th Cir. 1977)(en banc), *cert. denied*, 463 U.S. 914 (1978). In *Bass v. Estelle*, 705 F.2d 121 (5th Cir.), *cert. denied*, 104 S.Ct. 200 (1983), a federal habeas challenging a "spring of 1980" Texas conviction and death sentence, we specifically rejected a contention that the Texas contemporaneous

---

[39]    *See also, e.g., Ex parte Bagley*, 509 S.W. 2d 332, 333 (Tex. Crim. App. 1974); *Shumake v. State*, 502 S.W.2d 758, 761 (Tex. Crim. App. 1973); *St. John v. State*, 427 S.W.2d 862, 863 (Tex. Crim. App. 1968).

objection rule was not sufficiently "regularly applied" so that noncompliance with it could not bar federal habeas relief. *Id*. at 122. In doing so, we recognized that the "regularly applied" standard was met despite exceptions for instances where the law in effect at the time of trial would have precluded successful objection. *Id.* We also held that "an occasional act of grace by the Texas court in entertaining the merits of claim that might have been viewed as waived by procedural default" did *not* "constitute such a failure to strictly or regularly follow the state's contemporaneous objection rule" as to generally preclude reliance thereon to bar habeas relief. *Id*. at 122-123. We reviewed the matter at some length in *Amos v. Scott*, 61 F.3d 333 (5th Cir.), *cert. denied*, 116 S.Ct. 557 (1995), and, reaffirming the holdings of *Bass*, concluded that "Texas courts apply the contemporaneous objection rule strictly and regularly." *Amos* at 341. We noted that the question was whether the rule "is strictly or regularly applied *evenhandedly to the vast majority of similar claims*," *id*. at 339, that the presence of exceptions for a right not legally recognized at time of trial and for certain cases of fundamental error did not alter this conclusion, *id*. at 343-344, and that "the relatively few occasions . . . in which it might be said that the TCCA [Texas Court of Criminal Appeals] has disregarded the rule and its exceptions are not sufficient to undercut the overall regularity and consistency of their application and thus the adequacy of the state procedural bar." *Id*. at 345. To the same effect are *Sharp v. Johnson*, 107 F.3d 282, 285-86 (5th Cir. 1997),

45

and *Rogers v. Scott*, 70 F.3d 340, 344 (5th Cir. 1995), *cert denied*, 116 S.Ct. 1881 (1996).

Texas courts, and this Court, have long applied the Texas contemporaneous objection rule to bar claims that a conviction introduced in evidence without objection (or with objection only on another ground) was invalid. Decisions of the Texas Court of Criminal Appeals doing so include the following:

*Ex parte Gill*, 509 S.W.2d 357, 359 (Tex. Crim. App. 1974)(state habeas attacking 1970 conviction and sentence on basis that at trial evidence of revocation of probation for earlier offense was introduced, despite the fact that the revocation was invalid due to lack of counsel; held that although the revocation was invalid for lack of counsel, the failure to object at trial waived the error);[40] *Wright v. State*, 511 S.W.2d 313, 315 (Tex.

---

[40] Subsequently we granted federal habeas relief in *Gill*, but we did so *not* on the basis that the contemporaneous objection rule was not regularly applied but rather that under cases such as *Fay v. Noia*, 83 S.Ct. 822 (1963), and *Townsend v. Sain*, 83 S.Ct. 745 (1963), the mere failure to object did not constitute the "deliberate waiver . . . normally required" to waive constitutional rights. *Gill v. Estelle*, 530 F.2d 1152, 1155 (5th Cir. 1976). Rehearing en banc was granted in which our consideration was "limited only to addressing" and rejecting the state's argument that there was no constitutional invalidity in the probation revocation. *Gill v. Estelle*, 544 F.2d 1336 (5th Cir. January 10, 1977). On May 16, 1977, the Supreme Court denied *certiorari*. *Estelle v. Gill*, 97 S.Ct. 2199 (1977). Subsequently, on June 23, 1977, the Supreme Court handed down *Wainwright v. Sykes*, 97 S.Ct. 2497 (1977) holding that the "deliberate bypass" standard of *Fay v. Noia* and related cases was inapplicable in cases of procedural default under state law, and that the appropriate standard was that of "cause" and "prejudice." We have subsequently expressly recognized that in *Wainwright v. Sykes* the "court clearly has overruled the holding in *Gill v. Estelle* that failure to object to an enhancing conviction when admitted does not constitute a deliberate waiver." *Loud v. Estelle*, 556 F.2d 1326, 1330 n.12 (5th Cir., August 5, 1977).

46

Crim. App. 1974)(on appeal from revocation of probation for 1973 conviction for second offense DWI, a felony, treated as an appeal from 1973 conviction and sentence, rejects challenge to first offense conviction, a 1970 misdemeanor DWI, on grounds that defendant was not afforded counsel in the 1970 case, because of failure to object to the evidence of the prior conviction);[41] *Ex parte Sanders*, 588 S.W.2d 383, 384-5 (Tex. Crim. App. 1979)(en banc)(state habeas challenge to conviction enhanced by prior felony conviction, it being claimed that the prior felony was void because of lack of counsel; habeas denied because of failure to object to the proof of the prior felony; "[f]ailure to object to proof of a void conviction has been held to constitute waiver . . . [W]e hold that petitioner's failure to object when the complained of prior conviction was offered into evidence constituted a waiver of the claimed right");[42] *Ex parte Reed*, 610 S.W.2d 495, 497 (Tex. Crim.

---

[41] *Wright* notes that at the time of the 1973 trial the rule of *Argersinger v. Hamlin*, 92 S.Ct. 2006 (1972), establishing the right to counsel in misdemeanor cases, had been in effect for "almost a year," and that accordingly the case was "[u]nlike *Ex parte Casarez*, 508 S.W.2d 620" (Tex. Crim. App. 1974). *Wright* at 315. *Casarez* was a state habeas case successfully challenging an unappealed 1967 conviction and eighteen-year sentence on the basis that three prior misdemeanor convictions which were invalid because of lack of counsel were put in evidence at the 1967 trial without objection. *Casarez* states "Petitioner's trial resulting in the challenged conviction . . . was had . . . over five years before the decision in *Argersinger v. Hamlin. . . .* Consequently, counsel's failure to object upon a ground not yet established as a defect of constitutional magnitude did not constitute a waiver." *Casarez* at 622.

[42] *Sanders* also recognized that where the defect in the prior conviction had not, at the time of the trial at which the earlier conviction was put in evidence, been established as a defect of constitutional magnitude, the failure to object would not constitute a waiver, citing *Casarez* (*see note 41*, *supra*). *Sanders*

App. 1981)(en banc)(state habeas challenge to 1972 conviction and sentence on grounds, among others, of admission in evidence at the sentencing phase of prior convictions which were allegedly void because of ineffective assistance of counsel; "[w]ith regard to the claim that the allegedly void prior convictions were introduced at his trial . . . as part of petitioner's prior criminal record, we observe that there was no objection to the introduction of the evidence of the prior convictions at the time the exhibits were offered.  Therefore, he waived any claim he may now assert"); *Hill v. State*, 633 S.W.2d 520, 523-25 (Tex. Crim. App. 1982)(en banc)(appeal of conviction and sentence enhanced by 1963 conviction; pending this appeal, the 1963 conviction was set aside because the defendant was without counsel; held instant conviction and sentence affirmed because there was no objection at trial to the evidence of the 1963 conviction, citing numerous prior cases; "we hold that the failure to object at trial to the introduction of proof of an alleged infirm prior conviction precludes a defendant from thereafter attacking a conviction that utilized the prior conviction");[43]  *Ex parte Ridley*, 658 S.W.2d 179 (Tex. Crim. App.

held that exception inapplicable as the controlling Supreme Court precedent had been handed down before the trial at which the assertedly invalid prior conviction had been put in evidence.

[43]   *Hill* recognized an exception for cases "in which the underlying conviction was based upon void charging instruments." *Id*. at 523.  In such cases, Texas law viewed the trial court (in the prior case) as never having acquired jurisdiction. *See Ex parte White*, 659 S.W.2d 434, 435 (Tex. Crim. App. 1983)(habeas attack on conviction enhanced by prior conviction which was invalid because of "fundamentally defective" indictment, not barred by failure to object "since the trial court did not have jurisdiction where the indictment was void" and "since the charging instrument

1983)(en banc)(habeas attack on both 1967 burglary conviction and 1976 robbery conviction in which the sentence was (without objection) enhanced by the 1967 burglary conviction; habeas granted as to the 1967 conviction because the same jury that determined guilt also determined competence to stand trial; habeas denied as to 1976 conviction and enhanced sentence because "[t]he failure to object at trial to the introduction of an infirm prior conviction precludes the defendant from thereafter collaterally attacking the conviction that utilized the infirm prior conviction"); *Ex parte Cashman*, 671 S.W.2d 510 (Tex. Crim. App. 1983)(en banc)(state habeas attacking 1977 robbery conviction and sentence enhanced by 1969 Colorado conviction; the Colorado conviction was pursuant to a guilty plea; there was no objection to the evidence of the Colorado conviction at the 1977 trial or on direct appeal; after the 1977 conviction and sentence were affirmed on direct appeal, the defendant filed a motion in the Colorado court to set the Colorado conviction aside because the guilty plea was not

---

was void and the trial court never acquired jurisdiction" in the prior case); *Burney v. State*, 614 S.W.2d 834, 835 (Tex. Crim. App. 1981)(appeal from conviction enhanced by prior conviction which in the interim was set aside as based on defective indictment, failure to object to evidence of prior conviction does not preclude relief: "the fundamentally defective indictment deprived the trial court of jurisdiction" in the prior case); *Ex parte Howeth*, 609 S.W.2d 540, 541 (Tex. Crim. App. 1980)(habeas corpus granted because the prior conviction used to enhance punishment was based on defective indictment; "the indictment in cause number 72-281-C [the prior, enhancing conviction] was void, [so] the trial court did not have jurisdiction" in that prior case). As we observed in *Weaver v. McKaskle*, 733 F.2d 1103, 1107 (5th Cir. 1984), this void charging instrument exception to the Texas contemporaneous objection rule "is premised on the notion that the court rendering judgment in the prior conviction never had jurisdiction."

intelligently and knowingly entered, no factual basis was shown to support the plea and defendant did not receive effective assistance of counsel; the Colorado court granted the motion; habeas as to the 1977 conviction and sentence was denied because there was no objection at trial to the Colorado conviction).

The decisions of this Court have likewise long recognized that federal habeas relief sought on the basis that an invalid prior conviction was put in evidence at the petitioner's Texas trial is properly denied where the petitioner did not object at his trial to the evidence of the prior conviction as required by the Texas contemporaneous objection rule. *In McDonald v. Estelle*, 536 F.2d 667 (5th Cir. 1976), we affirmed a grant of habeas relief as to a 1973 Texas conviction and fifteen-year sentence because of the introduction at the punishment phase of the trial of a 1960 Arkansas theft conviction, based on a guilty plea, which we found constitutionally invalid because the defendant was indigent, did not have counsel, and was not offered and did not waive counsel. *Id*. at 671. "When objection to" this prior conviction (and others) "was raised up on direct appeal, the Court of Criminal Appeals of Texas refused to consider the challenges because no objection to them had been made at trial." *Id*. at 670. The Supreme Court granted certiorari and remanded to this court "for further consideration in light of *Wainwright v. Sykes*." *Estelle v. McDonald*, 97 S.Ct. 2967 (1977). On remand, we noted that evidence of the prior invalid and uncounseled Arkansas conviction "was not objected to" at defendant's Texas trial "as required by the Texas

contemporaneous objection rule" and that accordingly "[u]nder *Sykes*, petitioner is precluded from obtaining federal habeas relief due to his procedural default unless he can establish cause for failing to object." *McDonald v. Estelle*, 564 F.2d 199, 200 (5th Cir. 1977). We accordingly remanded to the district court "for the limited purpose of providing petitioner the opportunity to demonstrate cause for noncompliance with the Texas contemporaneous objection rule." *Id.* at 200.[44] In *Loud v. Estelle*, 556 F.2d 1326 (5th Cir. 1977), we rejected a habeas attack on a 1970 Texas conviction and life sentence as enhanced by two prior convictions, one of which petitioner asserted resulted when in 1960 his originally probated 1959 sentence was revoked "without a hearing, without counsel, and without petitioner's knowledge or presence," which he claimed was constitutionally required by *Mempa v. Rhay*, 88 S.Ct. 254 (1967). *Loud* at 1327-28. We held that under *Wainwright v. Sykes* "all attacks on the constitutionality of the 1960 revocation hearing are foreclosed by the petitioner's failure to object to the admission of the conviction at the punishment phase of his trial" and that "[a]fter *Wainwright v. Sykes*, petitioner has waived any objections he might have had to use of the 1959 conviction to enhance his sentence." *Loud* at 1329, 1330. In *Nichols v. Estelle*, 556 F.2d 1330 (5th Cir. 1977), *cert. denied*, 98 S.Ct. 744 (1978), we denied habeas relief as to a 1973 Texas conviction and life sentence under the Texas habitual offender statute based on a 1965 Oklahoma conviction which the petitioner

---

[44]     We noted we had already found prejudice. *Id.*

51

claimed was void because, *inter alia*, he was denied counsel on appeal, stating "But petitioner's counsel failed to object to the admission of the Oklahoma conviction on the ground that counsel had not been provided on appeal.  This failure worked a waiver of the constitutional error complained of here."  *Id*. at 1331 (footnote omitted)(citing *Wainwright v. Sykes* and *Loud*).  Our decision in *Weaver v. McKaskle*, 733 F.2d 1103 (5th Cir. 1984), is likewise controlling.  There we rejected Weaver's federal habeas challenge to his 1977 Texas robbery conviction and life sentence at the punishment phase of which evidence was introduced of Weaver's 1960 Illinois conviction.  At trial, Weaver objected to the Illinois conviction only on the ground that it was not final, as he had been pardoned.  In 1980, an Illinois court set aside the 1960 conviction because at the 1960 trial there existed a bona fide question as to Weaver's competency to stand trial, and no hearing had been held to determine his competence as required by *Pate v. Robinson*, 86 S.Ct. 836 (1966).  *Weaver* at 1104.  We held that the constitutional invalidity of the 1960 Illinois conviction did not entitle Weaver to habeas relief because of his failure to object at the 1977 trial to the 1960 conviction on that basis as required by the Texas contemporaneous objection rule, invoking *Wainwright v. Sykes* and *Engle v. Isaac*, 102 S.Ct. 1558 (1982). We explained:  "Under Texas law, a defendant's failure to object at trial to the introduction of an allegedly infirm prior conviction precludes a later attack upon the conviction that utilized the prior conviction. . . . Even where the alleged error is of constitution dimension," *id*., and

52

"Texas courts . . . have barred a subsequent attack on a conviction in which the sentence was enhanced through use of an uncounseled and void prior conviction where the defendant failed to object." *Id*. at 1107.[45]  More recently, in *Smith v. Collins*, 977 F.2d 951 (5th Cir. 1992), *cert. denied*, 114 S.Ct. 97 (1993), the federal habeas petitioner challenged his 1977 Texas conviction and life sentence on the basis that at the punishment stage of that trial evidence was introduced of his 1952 conviction which was subsequently (in 1985) set aside on the basis of a *Turner v. Louisiana*, 85 S.Ct. 546 (1965), violation.  We held that this challenge was barred under *Wainwright v. Sykes* and its progeny by the petitioner's failure to object at his 1977 trial to the introduction there of evidence of the 1952 conviction, as required by the Texas contemporaneous objection rule.

Hogue's argument that Texas' contemporaneous objection rule is or was not regularly followed in respect to invalid prior convictions is necessarily foreclosed by our decisions in *Loud* (1970 Texas trial; invalid prior Texas conviction); *Nichols* (1973 Texas trial; invalid prior Oklahoma conviction); *McDonald* (1973 Texas trial; invalid prior Arkansas conviction); *Weaver* (1977 Texas trial; invalid prior Illinois conviction); *Smith* (1977 Texas trial;

---

[45]     As previously observed (see note 43, *supra*), *Weaver* also states that "Texas recognizes an exception to the contemporaneous objection rule when the prior conviction used for enhancement is based on a void indictment," which "exception . . . is premised on the notion that the court rendering judgment in the prior conviction never had jurisdiction."  *Id*. at 1107.  We held that exception was not applicable to the petitioner's case in *Weaver*. *Id*.

53

invalid prior Texas conviction).  One panel of this Court may not

overrule another (absent an intervening decision to the contrary by

the Supreme Court or the en banc court, of which there are none).

But even if we were free to do so, we see no valid basis to depart

from those decisions.  They are well supported not only by the long

established general principles of the Texas contemporaneous

objection rule, but also by many decisions of the Texas Court of

Criminal Appeals applying that rule in the specific context of

failure to object to evidence of a prior invalid conviction, as

reflected by the above cited cases of *Gill*, *Wright, Sanders, Reed,*

*Hill, Ridley,* and *Cashman*.[46]

Only one of the cases relied on by Hogue can be said to be in

point, as the others all involve either a recognized exception to

the Texas contemporaneous objection rule plainly not applicable

here or are otherwise simply inapposite.[47]  This single case is

_____

[46]    We note that *Hill* cites with approval our decisions in *Loud*,
*Nichols,* and *McDonald*.  *Hill* at 524.

[47]    Most of the cases cited by Hogue involve the exception for
prior convictions based on void charging instruments (see notes 43
and 45 *supra*).  The cases of *Ex parte Garcia*, 578 S.W.2d 141 (Tex.
Crim. App. 1979); *Ex parte Rivers*, 559 S.W.2d 659 (Tex. Crim. App.
1978); *Ex parte Sunford*, 562 S.W.2d 229 (Tex. Crim. App. 1977); *Ex
parte Lucky*, 571 S.W.2d 913 (Tex. Crim. App. 1978); *Ex parte
Stewart*, 582 S.W.2d 144 (Tex. Crim. App. 1979); *Ex parte Howeth*,
609 S.W.2d 540 (Tex. Crim. App. 1980); *Burney v. State*, 614 S.W.2d
834 (Tex. Crim. App. 1981); *Ex parte Nivens*, 619 S.W.2d 184 (Tex.
Crim. 1981); *Duplechin v. State*, 652 S.W.2d 957 (Tex. Crim. App.
1983), and *Ex parte White*, 659 S.W.2d 434 (Tex. Crim. App. 1983),
*all* fall in this category.  This case does not involve a void
charging instrument, which, as the Court of Criminal Appeals in
*Hill* (and in *Duplechin* and *White*) and this Court in *Weaver*
recognized, presents a special situation (premised on the court in
the prior case never having had jurisdiction).  It does not
undermine the regularity of application of the Texas
contemporaneous objection rule to other instances of failure to

54

*Smith v. State*, 486 S.W.2d 374 (Tex. Crim. App. 1972). That was a direct appeal from a felony shoplifting conviction where a life sentence was imposed by reason of enhancement by two prior felonies alleged in the indictment. At the punishment stage the defendant pleaded guilty to the enhancement allegations. While the appeal was pending, the defendant caused one of the prior convictions to be set aside because the defendant was without counsel, and the Court of Criminal Appeals, in the direct appeal, accordingly modified the sentence to ten years (enhanced by only one valid prior conviction). The opinion does not discuss the failure to

---

object to evidence of invalid prior convictions. We squarely so held in *Weaver*.

*Corando v. State*, 617 S.W.2d 265 (Tex. Crim. App. 1981), holds that on direct appeal the court will notice on its own motion that the indictment in the conviction being appealed is void; it does not involve a prior conviction or evidence thereof. *Henderson v. State*, 552 S.W.2d 464 (Tex. Crim. App. 1977), was a direct appeal where there *was* proper objection below to the evidence of the prior invalid convictions. *Dinnery v. State*, 592 S.W.2d 343 (Tex. Crim. App. 1979), is an appeal from the revocation of probation in which the court reversed because the plea of guilty to the underlying offense of conviction was not supported by the evidence tendered; it does not involve a prior conviction or evidence thereof nor does it address any aspect of the contemporaneous objection rule.

*Ramirez v. State*, 486 S.W.2d 373 (Tex. Crim. App. 1972), was an appeal from the revocation of probation in which the underlying conviction was a 1970 plea of guilty to the felony charge of second offense child desertion, the first offense being a 1965 misdemeanor conviction for child desertion. At the revocation hearing it was established that at the time of the 1965 misdemeanor conviction the defendant was indigent and without counsel. Defendant was held entitled to relief. This fits within the "right not recognized" exception, as pointed out in *Wright, Sanders*, and *Casarez*, see notes 41 and 42, *supra*, as the 1970 trial was before the decision in *Argersinger v. Hamlin,* 92 S.Ct. 2006 (1972), establishing the right to counsel in misdemeanor cases. No such exception is, or is (or has ever been) claimed to be, applicable here. The presence of such an exception does not destroy the regularity of application of the Texas contemporaneous objection rule. *Amos,* 61 F.3d at 343-344; *Rogers*, 70 F.3d at 344.

55

object or even mention the contemporaneous objection rule. *Smith v. State* was expressly overruled en banc in *Hill*. Hogue argues that comes too late, for *Hill* was not decided until 1982, and he was tried in 1980. However, *Smith v. State* (a 1972 decision) had been effectively abandoned long before then. *Ex parte Gill* was decided in 1974, and applied the contemporaneous objection rule to an invalid prior conviction introduced at a 1970 trial; *Wright* was likewise handed down in 1974 and applied the contemporaneous objection rule to an invalid prior conviction introduced at a 1973 trial; so also with *Sanders*, a 1979 en banc decision; *Reed*, a 1981 en banc decision applicable to a 1972 trial; *Ridley*, a 1983 en banc decision applicable to a 1977 trial; and *Cashman*, a 1983 en banc decision applicable to a 1977 trial. *Hill* itself was applicable to a trial well prior to October 1981.[48] And, our decisions in *Loud* (1977), *Nichols* (1977), and *McDonald* (1977) apply the Texas contemporaneous objection rule to the failure to object to evidence of an invalid prior conviction and were all handed down years after *Smith v. State* and years before Hogue's 1980 trial, while in *Weaver* and *Smith v. Collins* we applied the Texas contemporaneous objection rule to 1977 trials. Further, all these decisions, both of the Texas Court of Criminal Appeals and of our court (except *Smith v. Collins*), were handed down years before the Court of Criminal Appeals affirmed Hogue's conviction on direct appeal. Finally, as

---

[48] We are unaware of the precise year of the *Hill* trial, but the original opinion of the Court of Criminal Appeals in that case was handed down in October 1981, so it was probably tried in 1980 or 1979.

56

*Hill* points out, *Smith v. State* was inconsistent with prior Texas decisions and the then long established Texas contemporaneous objection rule. *Smith v. State* cannot sustain the weight Hogue would place on it. This single 1972 decision does not rise even to the level of "the relatively few occasions" of disregard of the rule which *Amos* held were not sufficient to defeat the required regularity of application. *Id.*, 61 F.3d at 345. It is clear that Texas courts do and did apply the contemporaneous objection rule in at least "the vast majority" of claims similar to Hogue's. *Amos* at 339. We reject Hogue's contention to the contrary.

Hogue's third and final argument against applying the procedural bar of failure to comply with the Texas contemporaneous rule is that no Texas court expressly denied his complaint concerning the admission at the sentencing phase of the allegedly invalid Colorado conviction on that basis. In this connection, Hogue invokes the principle of *Harris v. Reed*, 109 S.Ct. 1038 (1989), that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case '"clearly and expressly"' states that its judgment rests on a state procedural bar." *Id.* at 1043. However, this rule of *Harris* "applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law." *Coleman v. Thompson*, 111 S.Ct. 2546, 2559 (1991). As we recognized in *Young v. Herring*, 938 F.2d 543 (5th Cir. 1991) (en banc), in *Coleman* "[t]he Court explicitly rejected Coleman's contention that the

*Harris* rule should apply whenever the state court decision does not contain a plain statement that it relied on a state procedural bar." *Young* at 553. In *Young* we likewise recognized that a necessary "predicate" to the application of the *Harris* rule "'is that the decision of the last state court to which the petitioner presented his federal claims most fairly appear to rest primarily on federal law or to be interwoven with federal law.'" *Young* at 553 (quoting *Coleman* at 2556). That necessary predicate is clearly lacking here, for no Texas court has ever to any extent addressed the merits of any portion of Hogue's claim that he was denied the effective assistance of counsel in his Colorado conviction, that that conviction was constitutionally (or otherwise) invalid, and that introduction of it at the sentencing phase of his trial deprived him of his rights under the Eighth and Fourteenth Amendments. Consequently, *Harris* does not avail Hogue.

The fact that the Texas courts have not actually applied the bar of the contemporaneous objection rule to Hogue's claim is not controlling because Hogue's claim was never presented to them prior to his sixth state habeas (and was then not *fairly* presented, *see infra* and note 35, *supra*) and the sixth state habeas was not accepted for filing because Hogue had previously been cited for abuse of the writ. In *Engle v. Isaac*, 102 S.Ct. 1538 (1982), three Ohio prisoners, Isaac, Bell, and Hughes, convicted of separate offenses in separate trials in Ohio courts, brought separate federal habeas petitions complaining of a jury instruction, given in each case, placing the burden of persuasion on the defendant

58

with respect to self-defense.  Isaac did not object to the instruction at trial, but did complain of it on direct appeal; the Ohio appellate court held the complaint was barred by failure to object at trial as required by the Ohio contemporaneous objection rule.  *Id*. at 1565.  Neither Hughes nor Bell objected to the instruction at trial or raised any complaint about it on direct appeal, nor did either pursue any state post-conviction remedies. *Id*. at 1563-64, 1566.  Despite the fact that neither Hughes nor Bell had ever presented their respective complaints to the state court, and the state courts in their respective cases had never actually applied any procedural bar to either of them, the Supreme Court held that their federal habeas complaints concerning the instruction were, just like those of Isaac, barred by their failure to comply with the well-settled Ohio contemporaneous objection rule.[49]  "Close analysis of respondents' habeas petitions reveals only one colorable constitutional claim.  Because respondents failed to comply with Ohio's procedures for raising that contention, and because they have not demonstrated cause for the default, they are barred from asserting that claim under 28 U.S.C. § 2254."  *Id*. at 1576.  Similarly, in *Teague v. Lane*, 109 S.Ct. 1061 (1989), the Court held that the petitioner's claim of a *Swain v. Alabama*, 85 S.Ct. 824 (1965), violation was procedurally barred

---

[49]     We observe that the *Isaac* Court noted in passing, with respect to Isaac's case, that Ohio appellate courts have the discretion, reserved for "exceptional circumstances," to excuse failure to comply with the contemporaneous objection rule in instances of "plain-error."  *Id*. at 1570 n.27; *see also id*. at n.44.

59

by his failure to raise it at trial or on appeal, as required by Illinois law, and he had never pursued state post-conviction remedies. *Id*. at 1068-69 (". . . we hold that petitioner's *Swain* claim is procedurally barred, and do not address its merits").[50] In both *Isaac* and *Teague* it was held that the exhaustion requirement was satisfied because state habeas clearly would not be available. *Isaac* at 1570-71 n.28; *Teague* at 1068. In essence, the Court in *Isaac* and *Teague* assumed that the state court, in deciding a state habeas, would deny it on the basis of the procedural bar arising from the failure to raise the issue at trial or on direct appeal. So, too, here. The Texas Court of Criminal Appeals did not decide or rule on, but rather refused to accept for filing, Hogue's sixth state habeas petition; but, assuming that petition adequately raised the instant complaint concerning the Colorado conviction, had the Court of Criminal Appeals accepted the petition and ruled on that complaint, the court clearly would have denied in *on the basis of* Hogue's failure to comply with the Texas contemporaneous objection rule. That is entirely as clear here as it was in *Isaac* and *Teague*. Moreover, "[s]tate collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings," *Murray v. Giarratano*, 109 S.Ct. 2765,

---

[50]     Although in *Teague* the petitioner had presented a Sixth Amendment fair cross-section claim on direct appeal (and apparently at trial) which had been addressed on its merits by the Illinois appellate court, the Supreme Court held that this did not constitute addressing the merits of a *Swain* claim so as to excuse the procedural default. *Id*. at 1068-69.

2770 (1989),[51] and we cannot imagine that the result in *Isaac* or *Teague* would have been any different had the states there involved simply had no state habeas procedure.

Hogue relies on the statement in *Teague* that:

> "The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one, where the claim was never presented to the state courts." *Teague* at 1069.[52]

Hogue reads this language as stating that *Harris* applies in every case except only when the claim was never presented to the state courts. But it does not say that. And any implication to that effect is dispelled by *Coleman*, where the Court expressly rejected the contention that *Harris* "applies in all cases in which a habeas petitioner presented his federal claims to the state court." *Coleman* at 2557-58. The *Coleman* Court observed "[t]his rule makes little sense," and went on to state:

> ". . . Coleman would have the federal courts apply a conclusive presumption of no independent and adequate state grounds in every case in which a state prisoner presented his federal claims to a state court, regardless of whether it fairly appears that the state court addressed those claims. We cannot accept such a rule. . . ." *Id.* at 1558.[53]

---

[51]    *See also Pennsylvania v. Finley*, 107 S.Ct. 1990, 1994 (1987) ("States have no obligation to provide this [post-conviction] avenue of relief").

[52]    We observe that no similar or comparable statement is contained in *Isaac*.

[53]    *Coleman* in substance overrules our cases such as *Booker v. Lynaugh*, 872 F.2d 100, 101 (5th Cir. 1989), stating that *Harris* overruled our previous decisions such as *O'Bryan v. Estelle*, 714 F.2d 365, 383-85 (5th Cir. 1983); *Stokes v. Procunier*, 744 F.2d 475, 478-81 (5th Cir. 1984); *Webb v. Blackburn*, 773 F.2d 646, 650–

61

As the Eleventh Circuit stated in the capital case of *Lindsey v. Smith*, 820 F.2d 1137, 1143 (11th Cir. 1987), *cert. denied*, 109 S.Ct. 1327 (1989), *reh'g denied*, 109 S.Ct. 1771 (1989): "*Isaac . . . demonstrates that the considerations of comity that underlie the procedural bar doctrine require federal habeas courts to honor state procedural rules, and not only state courts' procedural rulings.*"[54] Of course, *if,* notwithstanding the failure to comply with the state's procedural rules, the state court's denial of relief fairly appears to rest primarily on, or to be interwoven with, federal law, then federal habeas relief is not procedurally barred unless the state court in denying relief also clearly and expressly relies on the failure to comply with the state procedural rules. *Coleman.* *See also Isaac* at 1575 n.44. But here, "we deal

---

51 (5th Cir. 1983); and *Penry v. Lynaugh*, 832 F.2d 915, 918-19 (5th Cir. 1987), *rev'd on other grds*., 109 S.Ct. 2934 (1989), in which we held that an issue was procedurally barred by failure to comply with the state's contemporaneous objection rule despite the fact that the state courts never addressed the claim in question or mentioned the contemporaneous objection rule (in all those cases except *Stokes* the claim was raised neither at trial nor on direct appeal; in *Stokes* it was raised on direct appeal, though not at trial, but was not mentioned in the appellate court's opinion; in all the cases the claim was raised in state habeas and, except in *Webb*, the state habeas was denied without opinion or comment; in *Webb* the state habeas was denied solely on the basis that the issues had been decided on direct appeal, but the issue in question had not been raised on direct appeal).

[54]    *See also: Sykes* at 2508 ("The failure of the federal habeas courts generally to require compliance with a [state's] contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event"); *Reed v. Ross*, 104 S.Ct. 2901, 2907 (1984) ("To the extent that federal courts exercise their § 2254 power to review constitutional claims that were not properly raised before the state court, . . . legitimate state interests may be frustrated. . . .").

only with contentions of federal law which were *not* resolved on the merits in the state proceeding due to" the habeas petitioner's "failure to raise them there as required by state procedure." *Sykes* at 2507 (emphasis in original).

A somewhat analogous case is *Tower v. Phillips*, 7 F.3d 206 (11th Cir. 1993). There the federal claim at issue had never been raised in the state courts until the petitioner asserted them in two state post-conviction motions or petitions filed more than two years after his conviction had become final. Approximately a year and a half after the last of these motions or petitions was filed, petitioner filed his federal habeas. However, the state court never ruled on either post-conviction motion or petition despite petitioner's having apparently "written the clerk of the state court repeatedly concerning his pending motions." *Id*. at 209. As the *Tower* Court remarked, the petitioner "*did* present his claims in state court, but the state court never ruled one way or the other on the petitions." *Id*. at 210 (original emphasis). The Eleventh Circuit concluded that petitioner's state post-conviction motions or petitions were filed outside the two-year period allowed by state law and that the state law exceptions for instances where the relevant facts were not sooner known or reasonably knowable and for changes in the law were not applicable under the circumstances presented. *Id*. at 209 n.8. The Eleventh Circuit held that this failure to timely file the state post-conviction petitions or motions—which were the only raising of the federal issue in state court—constituted a state law procedural default which barred

63

federal relief absent a showing of cause and prejudice. *Id*. at 210-211. In so holding, the Eleventh Circuit expressly *rejected* the ruling of the "magistrate judge and district court below . . . that because the Florida courts never ruled on Tower's [post-conviction] motions, a showing of cause and prejudice was unnecessary." *Id*. at 210. The Court of Appeals explained that:

> "As *Coleman v. Thompson* makes clear, the *Harris* presumption may not be applied in cases in which the state court opinion did not, at a minimum, discuss the federal grounds at issue. . . . [W]e may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case. In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar." *Id*. at 211.

The court went on to hold that the petitioner had not shown cause for his state law procedural default and that accordingly the default barred federal habeas relief.

Here, as in *Tower*, the state courts have declined to rule on the only arguable assertion in state court of the relevant federal claim; with respect to that claim there was a clear failure to comply with the regularly enforced Texas contemporaneous objection rule; and, the most reasonable assumption, indeed the only reasonable assumption, is that had the Texas court ruled on the claim—i.e., had it accepted for filing Hogue's sixth state habeas (the only even arguable attempt to assert the federal claim in state court)—it would have enforced the procedural bar of Hogue's failure to comply with the Texas contemporaneous objection rule. In *Tower*, the petitioner's affording the state court an opportunity to rule on his federal claim combined with the state court's

64

failure to act on that opportunity did *not* prevent application of the procedural bar; similarly, Hogue's tendering of his sixth state habeas petition, combined with the Court of Criminal Appeals' refusal to accept it for filing because Hogue had previously been cited for abuse of the writ in connection with his fifth state habeas petition, should not prevent application of the procedural bar arising from Hogue's failure to comply with the regularly enforced Texas contemporaneous objection rule.

However it might be in some other possible set of circumstances, that conclusion is particularly appropriate here. Hogue's sixth state habeas did not *fairly* present his federal claim as that claim ultimately was made in the district court below. As explained in more detail in note 35 *supra*, Hogue's sixth state habeas petition contained a claim (the 31st out of 36 there asserted; none of the others are relevant), presented in less than two of that petition's 173 pages (exclusive of exhibits), that the admission of the Colorado conviction at his sentencing violated his rights under the United States Constitution in that the Colorado conviction was "void" because of "reliance on false testimony and other violations of Mr. Hogue's rights under state and federal law." The entirely conclusory "false testimony" theory, presumably in support of which the sixth state petition cites *Napue v. Illinois*, 79 S.Ct. 1173 (1959), a jury trial false testimony case, has not been pursued and appears facially inapposite to Hogue's Colorado guilty plea conviction. That leaves *wholly unspecified* "other violations." While the citation to *Boykin* might suggest a

contention that the trial judge failed to advise (or misadvised) Hogue of the rights he gave up by pleading guilty (see note 27, *supra*), there is absolutely no allegation to this effect in the petition (nor any allegation that Hogue was unaware of any of his rights), and no claim based on the judge's failure to advise, or misadvising, Hogue has been pursued. What has been pursued is ineffective assistance of counsel, yet this portion of the sixth state habeas petition makes no reference whatever to "counsel," "attorney," "lawyer," or the equivalent (or to any individual other than Hogue), or to the Sixth Amendment. While it does cite *Strickland*, and that would suggest some sort of ineffective assistance of counsel claim, the sixth state habeas contains no even conclusory allegations suggestive of *anything* any lawyer representing Hogue in his Colorado case either did or said or failed to do or say (nor does the sixth state habeas assert Hogue's innocence of the Colorado charge to which he pleaded guilty or that he was misinformed in any respect in that case). This is plainly not a fair presentation of the claim ultimately presented to the district court below, namely that Hogue pleaded guilty because his counsel advised him, without adequate investigation, that he would likely be convicted and should therefore accept the state's plea bargain offer.[55] *See, e.g., Nobles v. Johnson*, ___ F.3d ___, __

---

[55]     Indeed, as observed in note 35, *supra*, in affidavits attached to his fifth state habeas Hogue, and several of his relatives, had sworn that the reason he had pleaded guilty in the Colorado case was "because I was concerned that if I put my ex-wife through a jury trial that it would affect her emotional state of mind, and the possibility of this affecting my daughter." None of these affidavits stated that Hogue was innocent of the Colorado charge to

(5th Cir. 1997) (no fair presentation to state court "if the prisoner presents new legal theories or factual claims in his federal habeas petition"); *Graham v. Johnson*, 94 F.3d 958, 968-69 (5th Cir. 1996) (ineffective assistance of counsel claim not fairly presented to state court where in federal court petitioner "presented significant evidentiary support . . . never presented to the state courts"); *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir.), *cert. denied*, 107 S.Ct. 653 (1986) (no fair presentation to state court where federal claim contains "new factual allegations in support of a previously asserted legal theory"); *Brown v. Estelle*, 701 F.2d 494, 495-96 (5th Cir. 1983) (if claim in federal court is in a significantly stronger posture then it was in state court, it was not fairly presented to state court). *See also, e.g., Grubbs v. Singletary*, 120 F.3d 1174, 1178 (11th Cir. 1997) ("specific instances of alleged ineffective assistance of counsel" not previously presented to state court in connection with state court ineffective assistance claim).[56] Moreover, Hogue had been cited for abuse of the writ in connection with his earlier fifth state habeas, and that action was neither arbitrary nor discriminatory and can hardly have been a surprise or frustrated any reasonable expectation of Hogue's, as he had abused the writ, Texas courts had

---

which he pleaded guilty, or that his lawyer had advised him to plead guilty or that he had done so because of anything the lawyer did or said or failed to do or say; none of the affidavits state anything Hogue's Colorado counsel did or said or failed to do or say; none asserts that the Colorado conviction was invalid.

[56]    It is not decisive that the state had waived exhaustion. *See Graham* at 970-971; *Steele v. Young*, 11 F.3d 1518, 1523 n.10, 1524 (10th Cir. 1993).

on several previous occasions invoked that doctrine (see cases cited in note 33, *supra*), and in October 1987, months prior to Hogue's filing (through attorneys Mason and Bruder) of his fourth state habeas in January 1988, the district court below had ordered Hogue to file by January 1988 a state or federal habeas which would "present each and every claim known to Petitioner or his counsel on pain of waiver." That the Court of Criminal Appeals refused to accept for filing Hogue's sixth state writ, because he had been cited for abuse of the writ in connection with his fifth state writ, should not in these circumstances constitute some sort of waiver of Hogue's failure to comply with the Texas contemporaneous objection rule as to his present complaint concerning the Colorado conviction, a complaint almost buried in and not *fairly* presented by his sixth state habeas and never previously even hinted at.[57]

As noted, the district court determined that Hogue had "made no plausible suggestion of a valid cause for his failure" to comply with the Texas contemporaneous objection rule in respect to his present complaint concerning the admission in evidence of the Colorado conviction at the punishment stage of his trial. Hogue in his present appeal does not challenge this determination of the district court or otherwise urge that there was any "cause" which

---

[57] We also observe that it was not until years after the Court of Criminal Appeals' September 1992 refusal to accept Hogue's sixth state writ for filing that this Court in March 1995 withdrew its original (October 13, 1994) opinion in *Hicks*, holding the Texas abuse of the writ doctrine had been applied with sufficient regularity to constitute an adequate basis for procedural bar, and held to the contrary in *Lowe* (based on language in the Court of Criminal Appeals' 1994 opinion in *Ex parte Barber*).

68

excused this failure within the meaning of the "cause and prejudice" exception set forth in *Wainwright v. Sykes*, 97 S.Ct. 2497 (1977), and subsequent cases.[58] The failure to show "cause" is fatal to the invocation of the "cause and prejudice" exception, without regard to whether "prejudice" is shown. *Isaac*, 102 S.Ct. at 1575 n.43. However, even if no cause is shown excusing the procedural default—here failure to comply with the Texas contemporaneous objection rule—nevertheless that default will not bar federal habeas relief if imposition of such a bar would constitute a "'miscarriage of justice.'" *Sawyer v. Whitley*, 112 S.Ct. 2514, 2518 (1992). Where, as here, the asserted error (admission of Colorado conviction at the punishment stage) goes only to the sentence imposed in a capital case, such a "miscarriage of justice" is not established unless it is shown "by clear and convincing evidence that but for" the asserted "constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 2517. Hogue does not argue on appeal that this standard is met, and it is plain that it is not. A reasonable juror could, indeed in all likelihood would, have answered both of the punishment issues[59] in the affirmative had there never been any mention of the

---

[58]     And, we believe it evident that there was no such "cause." *See, e.g.,* notes 30 and 31, *supra*, and accompanying text. *See also Murray v. Carrier*, 106 S.Ct. 2639, 2644-45 (1986); *Smith*, 977 F.2d at 956-57.

[59]     That Hogue's conduct causing Markham's death was committed deliberately with the reasonable expectation that her or another's death would result and that there was a probability he would commit criminal acts of violence constituting a continuing threat to

69

1974 Colorado conviction.

Because Hogue did not object to—indeed he and his counsel affirmatively stated they did not object to—the introduction of the Colorado conviction at the punishment phase of his trial, he failed to comply with the settled Texas contemporaneous objection rule. Because he has neither claimed nor shown "cause" for this default or that a "miscarriage of justice" would result if the default barred federal habeas relief, we affirm the district court's determination that federal habeas relief on this claim is barred by the failure to comply with the Texas contemporaneous objection rule.

*No Substantial and Injurious Effect on Sentence Verdict*

Even if Hogue's complaint respecting introduction of the Colorado conviction at the sentencing phase were not procedurally barred (as we have held that it is) by his failure to comply with the Texas contemporaneous objection rule, we determine that Hogue would nevertheless not be entitled to federal habeas relief in respect to that complaint because we conclude, as did the district court, that the introduction of the conviction did not have a "'substantial and injurious effect or influence in determining the jury's [punishment phase] verdict.'" *Brecht v. Abrahamson*, 113 S.Ct. 1710, 1722 (1993).

Hogue argues that the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, 87 S.Ct. 824, 828 (1967), rather than the more lenient *Brecht* standard, should apply because no

society.

70

Texas court ever reviewed this claim and hence never applied the

*Chapman* standard.[60]   We reject this contention.   While Hogue's

---

[60]     Hogue does not contend that his complaint respecting introduction of the Colorado conviction at the punishment phase of his trial presents some kind of "structural" error (or the equivalent) as to which no sort of harmless error analysis whatever is appropriate and which "requires automatic reversal" even though harmless under the appropriate standard. *See Brecht* at 1717.  We, too, conclude that the error is not structural and that harmless error analysis is appropriate.   We do not read *Johnson v. Mississippi* as being to the contrary; indeed, the inference from *Johnson* is that the denial of relief there was reversed because the error *was* harmful under the circumstances of that case.  *Id.*, 108 S.Ct. at 1988-1989.   Further, *Johnson* involved a weighing state, where the argument for the error to be considered "structural" is stronger than in a nonweighing state such as Texas.  We note that the Eleventh Circuit has held that in federal habeas analysis for harmlessness is appropriate as to a *Johnson v. Mississippi* error in a "weighing" state death penalty case.  *Duest v. Singletary*, 967 F.2d 472, 480-482 (11th Cir. 1992) (applying *Chapman* standard), *vacated and remanded*, *Singletary v. Duest*, 113 S.Ct. 1940 (1993), *on remand, Duest v. Singletary*, 997 F.2d 1336, 1337-1339 (1993) (applying *Brecht* standard).  Moreover, had harmless error analysis been inappropriate on federal habeas for a *Johnson v. Mississippi* error, the Supreme Court in *Duest* would not have *vacated* the Eleventh Circuit's initial decision, which had *granted* habeas relief (finding the error not harmless beyond a reasonable doubt under *Chapman*), and remanded "for further consideration in light of *Brecht v. Abrahamson*."  *Duest*, 113 S.Ct. at 1941.   This view is also implicit in the Supreme Court's decision in *Romano v. Oklahoma*, 114 S.Ct. 2004, 2011 (1994).  *See also Clemons v. Mississippi*, 110 S.Ct. 1441, 1451 n.5 (1990), where the Court said of its opinion in *Johnson*:   "The Court did not hold that the Mississippi Supreme Court could not have applied harmless error analysis."

Nor do we consider our opinion in *Wiley v. Puckett*, 969 F.2d 86, 94 n.8 (5th Cir. 1992), to require that only a *state* court can find the present *Johnson v. Mississippi* error harmless (nor does Hogue so contend).  *Wiley* involved a *Clemons v. Mississippi*, 110 S.Ct. 1441 (1990), error in a weighing state death penalty case, and though we recognized that that sort of error was one properly subject to a harmless error analysis, we indicated that only a state court could find the error harmless.  *Wiley* at 94 n.8. However, *Wiley* did not involve a *Johnson v. Mississippi* error and it was decided prior to the Supreme Court's decision in *Duest*, which is inconsistent with the notion that a federal habeas court may not find a *Johnson v. Mississippi* error harmless.  *Wiley* is also prior to *Brecht*; and, several other circuits have declined to follow this aspect of *Wiley*.  *See Davis v. Executive Director*, 100

71

contention is supported by several decisions of the Eighth Circuit, *see Williams v. Clark*, 40 F.3d 1529, 1541 (8th Cir. 1994), *cert. denied*, 115 S.Ct. 1397 (1995); *Starr v. Lockhart*, 23 F.3d 1280, 1290-91 (8th Cir.), *cert. denied*, 115 S.Ct. 499 (1994); *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir. 1993), *cert. denied*, 114 S.Ct. 1631 (1994), so far as we are aware, all other circuits which have resolved the issue have declined to follow the Eighth Circuit's approach and have held that *Brecht*, rather than *Chapman*, enunciates the appropriate standard for determining whether a constitutional error was harmless in a federal habeas challenge to a state conviction or sentence even though no state court ever made any determination respecting whether or not the error was harmless. *See Davis v. Executive Director*, 100 F.3d 750, 772 n.20 (10th Cir. 1996), *cert. denied*, 117 S.Ct. 1703 (1997); *Sherman v. Smith*, 89 F.2d 1134, 1140-41 (4th Cir. 1996), *cert. denied*, 117 S.Ct. 765 (1997); *Tyson v. Trigg*, 50 F.3d 436, 446-447 (7th Cir. 1995), *cert. denied*, 116 S.Ct. 697 (1996); *Horsley v. State of Alabama*, 45 F.3d 1486, 1492 & n.11 (11th Cir.), *cert. denied*, 116 S.Ct. 410 (1995); *Smith v. Dixon*, 14 F.3d 956, 974, 979-80 (4th Cir.) (en banc), *cert. denied*, 115 S.Ct. 129 (1994). We agree with these decisions of the Eleventh, Tenth, Seventh, and Fourth Circuits, and hold that

---

F.3d 750, 768 n.18 (10th Cir. 1996), *cert. denied*, 117 S.Ct. 1703 (1997); *Williams v. Clark*, 40 F.3d 1529, 1539-40 (8th Cir. 1994), *cert. denied*, 115 S.Ct. 1397 (1995); *Smith v. Dixon*, 14 F.3d 956, 977-79 (4th Cir.) (en banc), *cert. denied*, 115 S.Ct. 129 (1994). In any event, *Wiley* is a weighing state case and we have never applied its rationale to a habeas challenging a death sentence imposed in a nonweighing state such as Texas. *Wiley* is simply inapplicable in the present context.

*Brecht* rather than *Chapman* states the appropriate test for us to follow in determining whether or not the introduction of the Colorado conviction at the punishment phase of Hogue's trial was harmless. We note in this connection that the reasons given by the Supreme Court in *Brecht* for adopting the *Kotteakos v. United States*, 66 S.Ct. 1239, 1253 (1946), harmless error standard for federal habeas review of nonstructural constitutional errors in state criminal cases are fully applicable whether or not the state courts have conducted a *Chapman* harmless error review. These reasons are comity, federalism, the state's interests in finality of convictions, the notion that federal habeas is to protect those grievously wronged, and the costs to society of retrying defendants who are released on federal habeas.[61] The *Brecht* Court likewise divided the cases it was addressing according only to two criteria, namely, first, whether they involved "structural" or nonstructural (generally "trial" type) constitutional error, *id*. at 1717, and, second, whether they were being considered on direct or on

---

[61] *See Brecht* at 1720 ("comity and federalism") and 1721:

> "Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a '"reasonable possibility"' that trial error contributed to the verdict, see *Chapman v. California*, 386 U.S., at 24, 87 S.Ct., at 828 . . . is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously wronged.' Retrying defendants whose convictions are set aside also imposes significant 'social costs,' . . . . [R]etrials following the grant of habeas relief ordinarily take place much later than do retrials following reversal on direct review."

collateral review.[62]  No third classification of cases was made for
those where the state court determined the error was harmless and
those that did not address harmlessness.  And *Brecht* concluded by
stating the following *general* rule:  "we hold that the *Kotteakos*
harmless-error standard applies in determining whether habeas
relief must be granted because of constitutional error of the trial
type."  *Id*. at 1722 (footnote omitted).  No exception or proviso is
stated respecting cases in which the state court did not conduct
*Chapman* harmless beyond a reasonable doubt review.  We will not
undertake to write in such a proviso.[63]

So, we apply the *Brecht* standard, which we have articulated as
follows:

> ". . . [U]nder *Brecht*, a constitutional trial error
> is not so harmful as to entitle a defendant to habeas
> relief unless there is *more* than a mere reasonable
> possibility that it contributed to the verdict.  It must
> have had a *substantial* effect or influence in determining
> the verdict.  We recognize, however, that if our minds
> are 'in virtual equipoise as to the harmlessness,' under
> the *Brecht* standard, of the error, then we must conclude
> that it was harmful. *O'Neal v. McAninch*, ___ U.S. ___,
> _____, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).
> Moreover, the *Brecht* standard does not require in order
> for the error to be held harmful that there be a
> 'reasonable probability' that absent the error the result
> would have been different. *Kyles v. Whitley*, ___ U.S.

---

[62]    *See id*. at 1720:  "Recognizing the distinction between direct
and collateral review, we have applied different standards on
habeas than would be applied on direct review with respect to
matters other than harmless-error analysis."

[63]    As the Seventh Circuit observed in *Tyson*, such a proviso or
limitation "would rob the [*Brecht*] decision of any general
significance." *Tyson*, 50 F.3d at 446.  If the state court finds no
error, it typically will not review for harmlessness (so also if it
finds the claim procedurally defaulted, but the petitioner is able
to show in federal court "cause and prejudice" respecting the
default).

___, ___ _ ___, 115 S.Ct. 1555, 1566-67, 313 L.Ed.2d 490 (1995)." *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir.), *cert. denied*, 117 S.Ct. 150 (1996).[64]

Hogue argues that the admission of the Colorado conviction at the sentencing stage of his trial was not harmless under this standard also. We disagree.

It appears clear that the decisive sentencing verdict factor was Hogue's conduct and state of mind over the more than twelve hours during which the offense was structured and committed, as well as the hours shortly before and after these. This was not a killing committed when an armed robbery unexpectedly went astray, or which resulted from action taken in the heat of sudden passion or with judgment clouded by drink, drugs, psychiatric episode, or immaturity. From Friday morning, January 12, 1979, until about 1:00 a.m. Saturday, January 13, Hogue terrorized Markham, Crawford, her eight-year-old son, and, later, Renick. Until the evening of Wednesday, January 10, they were all essentially strangers to him. His actions were obviously planned and deliberate, and he was basically calm, calculating, careful and manipulative throughout. Despite ample opportunity, he never attempted to back out of his

---

[64] We recognize, of course, that the mere fact that the evidence *exclusive* of the Colorado conviction was sufficient to sustain the punishment verdict (the jury's affirmative answer to each of the two special issues concerning, respectively, deliberateness and future dangerousness) does not alone suffice to establish that admission of the Colorado conviction at the punishment phase was harmless for purposes of *Brecht*. We reject Hogue's suggestion that the district court misapplied *Brecht* by finding it satisfied merely because the evidence apart from the Colorado conviction sufficed to support the verdict; on the contrary, the district court did not take such an approach and properly applied *Brecht*. In any event, we review the district court's harmless error conclusion de novo, and we independently apply the *Brecht* standard.

75

grisly enterprise.  He announced to the victims on more than one occasion that he was going to kill them all.  Markham and Renick were bound by Hogue and Crawford had received at his hands a potentially fatal knife stab in the stomach.  Markham was burned to death, firmly tied to the bed.  The intense mental terror and physical pain she must have felt defies adequate description.  While Crawford and Renick managed to escape the flames, and Renick was able to save her son, Crawford's stab wound was potentially fatal, and the terror she must have felt for her young son's and her own fate can scarcely be exaggerated.  In addition to his cruel and heartless murder of Markham, Hogue also raped Markham and stabbed Crawford in the stomach so hard that the knife penetrated the rear of her abdominal cavity.  He had previously forced Crawford, at gun point, to commit oral sodomy on him.  And, he not only intentionally killed Markham by firmly tieing her to the bed and then setting the house on fire, but also tried to kill Crawford, her young son, and Renick by the same means.

There is absolutely nothing by way of mitigation in respect to the extent of Hogue's moral culpability for these almost unimaginably heinous crimes.  Hogue never expressed any remorse whatever, but rather simply denied any wrongdoing at all, making up a bizarre and wholly unbelievable story that he was a victim and that Renick, in complicity with Crawford, was the murderer and stabber (denigrating both of these victims of his).  But the jury rejected this brazen effort.  Moreover, there was nothing to indicate that when these offenses were committed Hogue was in other

than complete command of his faculties.  There was no evidence that he was under the influence of any mind-altering substance—such as alcohol or drugs or anything else—or that he was undergoing any kind of psychiatric episode.  He was obviously somewhat intelligent and articulate.  He was not an immature youth, but rather a married twenty-eight-year-old man (albeit also with a then-current girlfriend "Kathy") who had been married at least once before and had at least one child.  There is no evidence of any provocation, any unusual temptation, or any sudden passion, or that Hogue was acting under the influence of any other person or under the pressure of outside circumstances or of some sudden, unexpected turn of events.[65]  There was no testimony—not even from his mother or other family members—as to his good character or as to anything good that he had done.[66]  Nor was there evidence that Hogue had any potential for rehabilitation.[67]  And, there was nothing to suggest

---

[65]     And, there was no evidence that Hogue suffered from any particular mental illness or defect which might lessen his moral culpability or that he had any character of abused, neglected, or deprived background.

[66]     To the contrary, two witnesses testified that his reputation for being a peaceable and law-abiding citizen was bad.  Another witness, Karen Hightower, testified that in July 1976, after befriending her with an offer of jumper cables, he lured her under false pretenses into a ride into the country and raped her at knife point.

[67]     The defense psychologist Dr. Dickerson did not interview Hogue or examine him or any records pertaining to him, and gave no testimony about Hogue personally or by way of hypothetical (except one brief hypothetical as to which he said only that such an offender would not likely be paroled).  The burden of Dr. Dickerson's testimony was twofold:  that future dangerousness could *never* be predicted, no matter *how clearly* a person's past dangerousness had been demonstrated; and that it was particularly unprofessional for the state's witness, Dr. Grigson, to predict

even the slightest contrition or remorse on Hogue's part. On this evidence, and wholly apart from the Colorado conviction, the conclusion that Hogue's killing of Markham was deliberate and that there was "a probability" that he "would commit criminal acts of violence that would constitute a continuing threat to society" (as inquired about in the punishment issues) seems inevitable.

Any possible adverse influence on the punishment verdict that Hogue's Colorado conviction for rape of his then wife Claudia—for which the evidence showed he served less than six months in all—might otherwise have had was essentially dissipated by the unchallenged evidence that the victim solicited Hogue's mother to take her to visit him at the reformatory where he was serving his brief sentence for the offense and by the pictures of them happily together there, both smiling and with her arms around him (Hogue's young child with them in two of the three pictures).

The Colorado conviction did not play a significant role in the punishment phase arguments. The prosecution devoted in all only five lines to it, one in the opening ("We know what happened in Colorado") and four in the closing ("He even told you that when he got to the penitentiary for rape, he only served ninety days. Somebody made a mistake, didn't they. And Jane Lynn Markham paid for it"), less than two percent of the entire prosecution punishment phase argument. The main thrust of the prosecution's

---

future dangerousness solely on the basis of a hypothetical and without personal examination (as Grigson did in Hogue's case).

punishment phase argument was the events of January 10-13.[68]

Moreover, it is plain that the Colorado conviction played no essential or prominent role in Dr. Grigson's testimony. Indeed, barely one percent of the lengthy hypothetical on the basis of which Dr. Grigson testified was devoted to the Colorado conviction, much more (over five times as much) was devoted to the Hightower rape, and the vast bulk—over ninety-two percent—was devoted to the events of early January 1979. Taking Dr. Grigson's testimony as a whole, it could not reasonably be concluded that his opinion would have differed if the Colorado conviction had not been included in the hypothetical.

---

[68] At oral argument before this Court, Hogue's counsel asserted that at the guilt-innocence stage argument the prosecutor sought to argue that Hogue was infatuated with Markham because she looked like the victim in the Colorado rape, who was *Claudia* Hogue (referred to by Hogue on redirect as his "ex-wife"). This is a plain misreading of the record. The evidence before the jury was entirely clear that Markham strongly resembled *Karen* Hogue, the women to whom Hogue was married in December 1978 and January 1979 (and, presumably, at trial), and it was that evidence to which the prosecution was referring; there was never any evidence that Markham resembled Claudia Hogue; indeed, the only evidence of what Claudia Hogue looked like was the pictures which the defense introduced at the punishment stage. Less than one percent of the prosecution's guilt-innocence argument was devoted to the Colorado conviction, all but three lines of this coming when the prosecution in its opening, going over the charge paragraph by paragraph, arrived at the paragraph dealing with the prior conviction and explained "The Defendant admitted on the stand he had been convicted in Colorado of rape. This is submitted to you for the purpose of aiding you, if it does, in passing upon the weight you will give his testimony, judging the credibility of him as a witness." In the middle of its closing guilt-innocence phase argument, the prosecution, in answering defense attacks on Renick's credibility, also stated (among many other things unrelated to the prior conviction), "You judge him by the testimony of this convicted rapist." The defense in its guilt-innocence argument contended that the record of Hogue's prior Colorado conviction was why the authorities did not—in the defense's view—adequately investigate the case.

As we have observed (see note 60, *supra*), *Johnson v. Mississippi* does not preclude harmless error analysis in respect to the Colorado conviction. We further note that *Johnson* arose in a weighing state and presented a situation where the subsequently invalidated conviction was *the only* evidence supporting one of the three statutory aggravating circumstances found by the jury, the jury was instructed, in accordance with Mississippi law, to *weigh all those* three aggravating circumstances against the mitigating circumstances, and the death sentence *depended* on the jury's finding that the statutory aggravating circumstances found outweighed the mitigating circumstances. *Id*., 108 S.Ct. at 1984. However, in Texas, unlike the situation in Mississippi, "the jury is not required to weigh aggravating against mitigating factors." *Stringer v. Black*, 112 S.Ct. 1130 at 1138 (1992). Indeed, Texas has no factors which it labels to the jury as "aggravating." Here, unlike the situation in *Johnson*, the jury was *not* told that it must treat the Colorado conviction as a weight on "death's side of the scale." *See Stringer* at 1137. Here, there was no reference whatever, directly or indirectly, to the Colorado conviction (or to previous convictions or offenses generally) in the court's punishment charge (and the only reference in the guilt-innocence charge was that it could be considered for no purpose other than how, if at all, it bore on Hogue's credibility as a witness). In this context, "the difference between a weighing state and a nonweighing state is not one of 'semantics.'" *Stringer* at 1137. These aspects of *Johnson* which strongly point to the harmfulness of

80

the error there are wholly absent here.

We are convinced that admission of the Colorado conviction at sentencing was harmless under *Brecht* and hence does not entitle Hogue to federal habeas relief.

*Conclusion as to Colorado Conviction*

We conclude, as did the district court, that Hogue's complaint as to admission in evidence of the Colorado conviction at the punishment phase of his trial is procedurally barred from consideration on federal habeas because of his failure to comply with the Texas contemporaneous objection rule, for which failure no cause is shown or claimed and there being no showing or claim that enforcement of the procedural bar would result in a "'miscarriage of justice'" under *Sawyer*.

We further conclude, as the district court also did, that the admission in evidence at the punishment phase of the trial of Hogue's Colorado conviction was harmless under *Brecht* and so, in any event, does not entitle Hogue to federal habeas relief.

## II.  Denial of Federal Evidentiary Hearing on Juror Bias Claim

In his second point on appeal, Hogue complains of the district court's denial of his request for an evidentiary hearing on his claim that one of the jurors in his case—Donnie Smith—"concluded prior to hearing any evidence that Mr. Hogue was guilty and that he should receive a death sentence."  In denying this claim, the district court relied on the fact findings of the state habeas court, determining that none of the exceptions stated in former 28 U.S.C. § 2254(d) was applicable.  *Hogue v. Scott*, 874 F.Supp. at

81

1534-1538. Hogue asserts this was error because he "submitted sworn evidence in the court below establishing that the state trial court's findings were not fairly supported by the record as a whole" and "the district court erred in refusing to conduct an evidentiary hearing on this issue after the state-court findings of fact were revealed as unsupported." The "evidence" to which Hogue refers consists only of two affidavits which were exhibits to his instant section 2254 petition, one by Bobby Hackett, the other by Charles Press. The district court also stated that it had "independently reviewed" the entire state record—which included a transcript of all the proceedings, testimony, and evidence before the state habeas trial court on this issue and the written findings and conclusions of that state habeas trial court and of the Texas Court of Criminal Appeals—and also the affidavits of Hackett and Press, and "has concluded that, if findings were appropriate by this court . . . this court would make the same findings the state [habeas] court made." *Id*. at 1539. Hogue contends, without citation of authority, that this too was error because the district court should not make findings without an evidentiary hearing.

We reject Hogue's claims in this connection.

Hogue's claims concerning juror Smith were raised (along with various other claims) in his fourth state habeas filed, by attorneys Mason and Bruder, January 22, 1988. An evidentiary hearing was held on this claim in the state court on March 24, 1988, at which Hogue was represented by Mason and Bruder and at which former juror Smith, Mary Ebel (Hogue's mother), and Hogue's

82

former trial counsel, Coffee, testified in person; on May 9, 1988, attorney Mason took the oral deposition of Harley Belew; a further evidentiary hearing was held August 8, 1988, at which Hogue was represented by attorney Mason and at which Burns, one of Hogue's former attorneys on direct appeal, testified in person as did also Dennis Enos. The transcript of the May 9, 1988, deposition was introduced at the August 8, 1988, hearing. The state trial judge (not the judge who tried the case, as he had died in the interim) on November 1, 1988, made written findings of fact and conclusions of law rejecting Hogue's claims and recommending denial of relief. The Court of Criminal Appeals denied relief by written order of January 6, 1989, stating in relevant part:

> "The trial court, after holding a hearing, has entered findings of fact and conclusions of law along with a recommendation that this Court deny relief. This Court has carefully reviewed the record with respect to the allegations brought by applicant and finds that the trial court's findings and conclusions are fully supported by the record.
>
> All relief sought is therefore denied."

The essence of the claim about juror Smith which Hogue asserts in this appeal is that Smith, after he had been selected as a juror but before the taking of evidence commenced, while at a small gathering in the home of his friend Belew, told Enos, who was likewise present and whom Smith and Belew had each known for some time, that he, Smith, had been selected as a juror in Hogue's case and, according to Enos' testimony at the state evidentiary hearing, Smith then said "he had been reading in the newspaper, and from what he had read he believed the man was guilty and he was going to

83

do everything in his power to burn him." There was nothing at all to suggest anything about what it was that Smith had supposedly read in the newspaper. Enos testified that since some time in 1981 he had been serving prison sentences totaling thirty years and had been in trouble with the law since he was a young adult.[69] At the state evidentiary hearing, Smith testified unequivocally and repeatedly that he never mentioned or discussed the case with Enos or Belew (or anyone else outside the jury room) at any time before the punishment verdict. He believed he talked with one or both of them about it *after* the punishment verdict, but did not recall what was said. When chosen as a juror, Smith had no information about the case other than that it was a murder case, he had no preconceived attitude in respect to guilt or innocence or punishment, he fairly considered the evidence and based his guilty verdict and punishment verdict on the evidence, and answered truthfully all the questions on *voir dire*.[70] There is nothing to indicate Smith had ever been in trouble with the law; he taught Sunday school and had served in the Marine Corps. Belew testified at the state evidentiary hearing that he recalled hearing parts of a conversation between Smith and Enos at his house concerning a

---

[69] The sentences Enos was serving were a twenty-year sentence imposed in Dallas County for aggravated robbery and four concurrent ten-year sentences imposed in Tarrant County for two burglaries of buildings, one attempted burglary, and one obtaining drugs by fraud. Previously he had plea bargained a charge of obtaining drugs by fraud in 1979, in 1978 he had been charged with possession of a forged writing, and in 1975 with passing a forged check.

[70] On *voir dire*, Smith had said, among other things, that he had read nothing about the case, and did not take a newspaper, and had no bias or prejudice about the case.

case.  Belew could not recall when this conversation took place, whether before the trial started or after it was over, but he stated that "part of it [the conversation] was that Donnie [Smith] either was or had been, and I'm pretty sure he had been, in a trial."  Belew further stated that the conversation agitated Enos because Smith had said something to the effect that he "had it in for the guy [Hogue] from the beginning" and "that's [apparently, the verdict] what he wanted from the start."  Some time later, Enos talked to Belew about the conversation and how it upset him.  Belew thereafter talked to Smith about it.  Smith was offended that Belew had assumed he (Smith) had been serious in talking to Enos; on the contrary, he took his jury duty very seriously and said he was just "Pulling Dennis' [Enos'] leg," "razzing him," and "getting him going."  Belew was convinced, after talking to Smith, that this was the truth, that Smith had "been pulling Dennis' [Enos'] leg and Dennis had overreacted."  Belew testified that Enos "is a pretty easy person to get . . . him going like that and Donnie [Smith] knew that," and that Smith was "the type of person who when he sees the opportunity tends to pull people's legs."

The state habeas trial judge's findings included the following:

> ". . .8.  Smith did not have any preconceived prejudice against Applicant. . . .
>
> 9.  Smith did not have any advance knowledge of the facts of this case or Applicant's connection with it, except for the normal generalized knowledge, such as the fact that it was a murder case. . . .  He had no preconceived determination to impose the maximum punishment on the Applicant. . . .

85

. . .

11. After Applicant's trial was over and Smith had finished his service as a juror, Smith had a conversation with Dennis Enos at the home of Harley Belew. . . . Smith and Belew were friends of long standing, and Smith had known Enos well since junior high school or earlier. . . . Smith knew Enos could easily be maneuvered into getting angry if Smith got into an argument with him and took a strong position he knew Enos disagreed with. . . . Smith often did this with Enos and other acquaintances as a form of teasing; it amused Smith to successfully 'pull the leg' of people in this fashion. . . . During their post-trial conversation at Belew's residence, Smith successfully employed this tactic against Enos when he suggested to Enos that he was prejudiced against Applicant prior to serving as a juror. . . .

12. Smith does not deny that such a conversation with Enos took place, but he is unable to recall the conversation. Smith does deny that any such conversation took place before or during trial, and this Court finds that Smith is telling the truth in this respect; the conversation with Enos took place <u>after</u> the conclusion of Applicant's 1980 trial in this case. . . .

13. Smith was in fact not prejudiced against Applicant prior to trial. He intimated to Enos that he was, but did so only to get a 'rise' out of Enos during his post-trial conversation with Enos. . . .

. . .

19. Applicant was tried by a jury of twelve fair and impartial jurors. . . .

. . .

<u>CONCLUSIONS OF LAW</u>

1. Applicant was not deprived of due process or a trial by a fair and impartial jury by Donnie Ray Smith's service as a juror, nor did the actions of . . . Smith deprive Applicant of due process or a fair and impartial jury."

We hold that the state habeas court's fact findings are fairly supported by the record as a whole. The findings that the challenged conversation took place after the trial was over, and

86

that Smith was in fact an impartial juror, involve credibility choices the state court was fully competent to make.

Nor do the affidavits of Hackett and Press justify failing to apply former section 2254(d)'s presumption of correctness. Hackett's affidavit states that "[i]n 1980-1981" he was hired by attorney Casey—who then represented Hogue—to investigate allegations of juror misconduct in the trial, and that at a wholly unspecified time[71] in the course of his investigation he spoke to Belew, apparently on the telephone, and his recording of this conversation includes a statement by Belew that at Belew's home, on "the night of the television episode were [sic] J.R. got shot on Dallas" Smith said to Enos "he was getting tired of the bleeding heart liberal stuff and that if he got a chance he would let the guy have it, that was like before trial or during trial." The affidavit of Press state that an Austin television station employee told him that CBS in New York had told her that the "Dallas" episode in which J.R. Ewing was shot first aired March 21, 1980(a date after Smith as selected as a juror and before the commencement of evidence). In the first place, we note that Hackett's affidavit as to what Belew said to Hackett on the telephone approximately a year after the trial is hearsay, and is not substantive evidence of anything. At most it (together with Press's affidavit) could serve to impeach Belew insofar as he indicated the conversation between Smith and Enos likely took place after trial, although he was not

---

[71]    The state habeas hearing indicates this conversation with Hackett occurred about a year after the trial.

sure.  It could *not* impeach Smith or be substantive evidence of when the conversation took place, a matter on which Hogue had the burden of proof.  Moreover, the state trial judge found that whatever Smith said to Enos was not meant seriously.  Just because a juror once expressed pre-trial conceptions of guilt does not preclude a fact finding, to which federal habeas courts must defer, that the juror was in fact impartial.  *See Patton v. Yount*, 104 S.Ct. 2885, 2891-93 (1984).

In any event, it is clear that *Keeney v. Tamayo-Reyes*, 112 S.Ct. 1715 (1992), bars consideration of the Hackett and Press affidavits, and Hogue has presented no argument why this is not so. Not only is there no suggestion (in Hackett's affidavit or otherwise) or claim of any external impediment or reason preventing Hogue from knowing of and presenting the Hackett information at the state habeas hearing, the state record makes clear that the defense in fact had that information and Hackett's report at the state hearing.  At the March 8, 1988, state hearing Hogue's attorney Mason commenced to read from what he described as a report of "what Mr. Belew said to an investigator named Hackett, approximately twelve months after the trial."[72]  In his May 9, 1988, deposition, Belew was asked by Mason if he recalled talking to "an investigator named Hackett" "approximately a year or two after the trial."[73]

---

[72]     The reading did not progress very far before an objection was made; no ruling was made on the objection, and the discussion turned to other matters.

[73]     Belew said he did not, and asked Mason "Did he say I did?", to which Mason replied "Yes," Belew then saying "Well, there you are."

We hold that the district court did not err in according the presumption of correctness to the findings of the state habeas court respecting juror Smith and in denying Hogue's request for an evidentiary hearing on that matter.[74]

### III. *Furman v. Georgia* and Ex Post Facto Claims

Hogue's third and final complaint on appeal is that "the district court erred in denying relief on Mr. Hogue's ex post facto and *Furman* [*v. Georgia*, 92 S.Ct. 2726 (1972)] claims without conducting a genuinely *de novo* review."

---

[74] In a footnote to his appellant's brief, Hogue also cites the testimony of his mother, Ebel, at the state habeas hearing on March 8, 1988, to the effect that while sitting outside the courtroom during *voir dire* she heard a person, whom she identified as Smith, talking about the case and saying to another venireman "from what I have read in the newspaper, there is no doubt that he is guilty, and if I'm—I'm going to hang him if they'll let me as [sic] a jury." Smith, in his testimony at the state evidentiary hearing, adamantly denied ever making any such or similar statement. Ebel's testimony was undercut by other factors as well. She testified she reported that conversation to Hogue's counsel, Coffee, the same afternoon. At the state evidentiary hearing, Coffee clearly testified no such report was made to him. Also, Ebel was clear that this occurred on the second day of jury selection. That was March 11. However, Smith was in the second batch of veniremen summoned, and he did not come for *voir dire* until March 17. The state habeas court found:

> "10. At no time, either prior to or after his individual voir dire, did Applicant [sic; obviously, "Smith" is intended] tell a fellow venireperson that he had read about Applicant's case in the newspaper; nor did he ever tell such a person that there was no doubt about Applicant's guilt, or that he would 'hang' Applicant if he were put on the jury. . . . Applicant's mother did not overhear such a conversation, and she did not at any time tell Applicant's trial counsel that she overheard such a conversation."

This finding is fairly supported by the record as a whole and the district court did not err in according it the presumption of correctness or in not holding an evidentiary hearing thereon.

The district court rejected these claims, generally agreeing, as do we, with the decision of the Court of Criminal Appeals in respect thereto. *Hogue v. Scott*, 874 F.Supp. at 1543-1544; *Hogue v. State*, 711 S.W.2d at 712-13.

We too reject these claims.

While Hogue's appellant's brief does not explain what his ex post facto claim is, in his reply brief he seems to argue that it was not the intent of the Texas legislature, in enacting the capital murder statute, Tex. Penal Code § 19.03(a)(2), to include murder while committing arson in those instances where the victim's death was caused by the arson—the fire or fire and smoke—itself. We reject this contention. The statute as written (see note 2, *supra*) plainly includes such an offense, and nothing in the wording of the statute tends to exclude it; nor is there any clear and specific legislative history or official commentary to the contrary. No Texas court decision is cited supporting Hogue's construction of section 19.03(a)(2), and we are aware of none. The Court of Criminal Appeals held that the statute applied. *Hogue*, 711 S.W.2d at 12-13. There being nothing unreasonable about this construction, Hogue's ex post facto argument amounts to no more than a disagreement as to state law, a matter not cognizable on federal habeas.

Hogue's *Furman* claim is essentially that where the victim's death is caused by the arson there is a double counting, the "act" constituting the murder is also the "act" constituting the underlying felony of arson, and that thus section 19.03(a)(2) does

90

not in such an instance adequately narrow the class of murderers who are eligible for the death penalty. Hogue points to no precedent *dictating* this result, and his contention is hence barred by *Teague v. Lane*, 109 S.Ct. 1060 (1989).[75] We so hold in respect to the similar contentions raised in *Fearance v. Scott*, No. 94-10686, 51 F.3d 1041 (table) (5th Cir. March 21, 1995) (unpublished), and *West v. Johnson*, 92 F.3d 1385, 1398 n.17 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 1847 (1997). *See also In re West*, 119 F.3d 195 (5th Cir. 1997).

Even if we considered the point, we would find it without merit. Contrary to Hogue's argument, there is not merely "one intent"; here, there must be *two* specific intents, first to burn the building and second to kill Markham. Hogue's argument that arson is unique among the predicate felonies listed in section 19.03(a)(2)—kidnaping, burglary, robbery, aggravated rape, and arson—in requiring only one "act" is likewise mistaken. For example, one who attempts robbery by shooting his victim with intent to kill, and thereby kills him, is likewise guilty of capital murder. Moreover, "one act" is all that is required for the offense of capital murder by murdering a peace officer or fireman known to be acting in the lawful discharge of official duty (section 19.03(a)(1)) or capital murder by murdering for the promise of remuneration (section 19.03(a)(3)). Hogue does not claim that murder, *other than* by burning, while committing arson is

---

[75] It is clear that neither of the two *Teague* exceptions is applicable here.

not legitimately a capital offense, and we can see no reason that a state *must* treat Hogue more leniently because he intended to kill Markham by burning her to death in the house fire, as she lay affixed to the bed to which he had firmly bound her, than if he had shot her just before the flames reached her.  We note also that even for capital murder a death sentence is not available unless the jury answers all the punishment issues in the affirmative.

We reject Hogue's third and final complaint on appeal.

## Conclusion

Having considered and rejected each of Hogue's contentions on appeal, the judgment of the district court denying habeas relief is accordingly

AFFIRMED.